Filed 11/17/17 (unmodified opinion attached); Reposted 11/21/17 to retain format of filed opinion
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| BRET CORNELL, <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> CITY AND COUNTY OF SAN FRANCISCO, et al., <br><br>     Defendants and Appellants. | A141016 & A142147 <br><br> (City & County of San Francisco Super. Ct. No. CGC11509240) |

THE COURT:

It is ordered that the opinion filed herein on November 16, 2017, be modified as follows, with the modifications to be carried out in the following sequence:

1.     On page 33, move footnote 27 from the end of page 33 after "(*Id.* at p. 953.)" to page 35 after the sentence ending in "in short, jail overdetention" so that the text reads as follows:

> Thus, the nub of his Section 52.1 theory was not unlawful arrest, but rather his continued incarceration despite a judicial release order—in short, jail overdetention.[27]

2.     On page 11, delete the reference to footnote 7 that appears in the following sentence:

> With liability for false arrest and negligence established in Phase I, the jury returned a Phase II special verdict finding liability on the tortious interference and Section 52.1 claims,[7] awarding total damages of $575,231, including $234,007 in past economic damages, $266,224 in future economic damages, and $75,000 in past non-economic damages, with judgment entered accordingly.[8]

After deleting footnote 7, all subsequent footnotes shall be renumbered.

1

There is no change in the judgment.


Dated: _____                    _____, P.J.

Filed 11/16/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| BRET CORNELL,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO, et al.,<br><br>  Defendants and Appellants. | A141016 & A142147<br><br>(City & County of San Francisco Super. Ct. No. CGC11509240) |

Police officer trainee Bret Cornell, while off-duty and in street clothes, went for a run one morning in Golden Gate Park, stopping for a brief rest on a knoll called Hippie Hill. Two uniformed patrol officers in the area spotted him, thought he looked "worried," and grew suspicious because the bushes on Hippie Hill are known for illicit drug activity. As the patrolmen began to approach Cornell, but before they reached him or said anything to him, he resumed his run. The officers gave chase, joined in pursuit by two other officers who responded to a call for backup. One of the officers, with his gun drawn, eventually caught up to Cornell on a trail in some nearby woods.

Cornell claims he had no idea he was being chased or that the officers wished to speak with him. On the trail, he says he heard a shout from behind, "I will shoot you," and looked over his shoulder to see a dark figure pointing a gun at him. He darted away, ultimately finding what he thought was refuge with a police officer awaiting his arrival some distance away at the top of a stairway in AIDS Memorial Grove. But to his surprise when he arrived there, that officer ordered him to the ground. He was arrested at gunpoint and searched, taken in handcuffs to a stationhouse for interrogation, and eventually to a hospital for a drug test, which was negative.

1

In the meantime, a team of officers went back to Golden Gate Park, spoke to people who had seen Cornell that morning, and conducted a search of the areas where he was known to have been, and of his parked truck. No evidence of involvement with drugs turned up, and after nearly six hours in custody, Cornell was released. As he was leaving the stationhouse, he was given a criminal citation for evading arrest in violation of Penal Code section 148. Other than cursory questioning by the officers who issued the citation, no one in a position of higher authority ever interviewed him or asked for his side of the story. Cornell was never prosecuted, but he lost his job as a result of the arrest and citation.

To recover for the damage done to him, Cornell sued the four arresting officers, the Chief of Police, and the City and County of San Francisco. Following phase one of a bifurcated jury trial on special verdict forms, the trial court, relying on findings of fact by the jury in the initial phase, determined that Cornell was arrested without probable cause, thereby establishing liability for false arrest, and prompting the defense to stipulate to liability for negligence. In phase two, the jury returned a verdict for Cornell on two remaining claims, tortious interference with economic advantage, and violation of Civil Code section 52.1 (Section 52.1), awarding total damages of $575,231. Following trial, the court added $2,027,612.75 in attorney's fees and costs on the Section 52.1 claim.

These consolidated appeals are from the ensuing judgment and the award of attorney's fees and costs. The appellants argue 1) as a matter of law, the jury's phase one findings do not support the trial court's determination that probable cause was lacking, 2) the trial court should have declared a mistrial when the jury deadlocked on one of 18 questions put to it in the phase one special verdict form, 3) the trial court failed to address their argument that, under Penal Code section 847, subdivision (b), they are immune from claims for false arrest, and 4) even if the verdict on the tort claims is upheld, the Section 52.1 verdict and accompanying award of fees and costs must be reversed because there was insufficient evidence to submit that claim to the jury.

Seeing no error, we affirm.

# I.      BACKGROUND

## A.      The Evidence at Trial

In July 2010, Bret Cornell, a recent graduate of the police academy employed by the San Francisco Police Department as a field officer trainee, went for a morning jog in Golden Gate Park at around 7:00 a.m., after finishing a night shift. He was dressed in gray canvas pants cut off at mid-ankle, a plaid fleece jacket over a dark t-shirt, and running shoes. After running a considerable distance, at around 8:00 a.m., he ran across Sharon Meadow and stopped to rest at the top of Hippie Hill, just as a police cruiser drove through the trees up to the crest of the hill along a pedestrian pathway. He looked at the car, and not wanting to interfere with whatever the officers were doing, walked down to the bottom of the hill.[1]

The two uniformed officers in the cruiser, David Brandt and Richard "Brett" Bodisco, considered Hippie Hill to be a high crime area. Both officers had made numerous narcotics arrests there, mostly involving drug transactions in the bushes, and there had been a homicide in the park a few days earlier. According to Officers Brandt and Bodisco, they drove up the pathway to gauge the reaction of people on the other side of the crest who could not see them coming. Cornell, a stranger to the officers, glanced at their car when they came into view, and then looked away. Cornell was by himself, not talking to anyone, had nothing in his hands, and was not doing anything specific to arouse suspicion. Officer Brandt described Cornell as having a "clean-cut" look, which he said was consistent with someone who was a recent parolee.[2] Because Cornell

---

[1] Cornell testified that when he saw the officers' car, he thought it "odd" they were driving on a pedestrian path, "figured . . . they were doing some kind of official operation," and wanted to avoid them because "I didn't need to get myself involved in any official operations" while off-duty. He explained that "in field training we are not allowed to have any off-duty contact. We are not supposed to be getting involved in official police matters if we can avoid it."

[2] On cross-examination, Officer Brandt admitted Cornell's appearance was also consistent with that of a recent graduate of the police academy.

3

appeared to be "worried" in their presence, Officers Brandt and Bodisco turned their car toward him and decided to initiate a consensual encounter. They did not activate their lights, or say anything to him over their loudspeaker.

As the officers turned toward Cornell, and as he walked away from them, headed downhill, he looked back briefly in their direction and then began running. With their suspicions aroused, the officers decided to chase Cornell and detain him. Officer Bodisco jumped out of the car and made a radio call for backup to assist in setting up a perimeter to cut Cornell off from any escape. The call, which drew the assistance of two more uniformed officers, Jesse Farrell and Sergeant Wallace Gin, included a description of Cornell and the direction he was headed, but no other details. When Officer Bodisco's call for backup went out, the police dispatcher asked "What's the want?" Officer Bodisco responded, simply, "[R]unning." According to Officer Brandt, the call gave no specifics because at that point "we didn't have anything specific." Surveying the area from the top of the hill to see where Cornell went, Officer Bodisco testified he saw Cornell go off path through some bushes, reappearing below the hill without his plaid jacket and wearing only a dark shirt, which the officers took to be an attempt to throw them off his track.

When Cornell left Hippie Hill, he was unaware the officers wanted him to stop. His explanation for discarding his fleece jacket was that, after an hour's run, he was feeling hot. Having unsuccessfully tried to tie his fleece jacket around his waist while running at an earlier point on his route, he folded it and placed it on a tree stump to retrieve later. He said he had done that before and had no problem with anyone taking it, and even if someone did take it, the garment was inexpensive and easily replaceable. Once the officers caught sight of Cornell from their vantage point on Hippie Hill, Officer Bodisco set out after him on foot. Officer Brandt, still in the cruiser, drove down and around the hill, past some tennis courts, and along nearby Bowling Green Drive. As he drove, Officer Brandt stopped to ask two people along the way if they had seen someone

4

matching Cornell's description; one person claimed to have seen someone running near the tennis courts, and another said he had heard some rustling in bushes up a winding dirt trail nearby.

Continuing in the direction these park users pointed out, Officer Brandt's search took him to the bottom of a trail known as the High Path, a dirt pathway lined on both sides by trees and brush, leading up a hill beyond Bowling Green Drive at the entrance to the AIDS Memorial Grove. Officer Farrell arrived and joined Officer Brandt at the bottom of the High Path, and the two of them began proceeding up the trail, with Officer Brandt in the lead. Officer Brandt described the trail as dark and having a "cave[-like] appearance." He unholstered his gun at this point and held it in a "low ready" position, not because of any specific threat, but because of "fear of the unknown." Officer Farrell, for his part, perceiving no threat, left his gun holstered.

Officer Brandt caught sight of Cornell walking up ahead and eventually came close enough to confront him. Officer Farrell was directly behind Officer Brandt, could see that Cornell appeared to be "clean cut," was not armed, had nothing in his hands, and was doing nothing threatening. Officer Brandt shouted something at Cornell. Both officers recall Officer Brandt unmistakably ordering Cornell to stop at that point,[3] causing Cornell to pause, half turn in their direction, look at them squarely, and then dash away at full speed, taking a route downhill through the trees in a clear effort to evade capture.

Cornell—who testified he still had no idea he was being pursued by police officers during the encounter on the High Path—said he heard a "disturbance" behind him and then heard the words "I will shoot you," which prompted him to glance over his shoulder and see a dark figure pointing a gun. He said he took off sprinting in desperate flight

---

[3] What exactly Officer Brandt shouted was disputed (Officer Brandt—"stop[,] police"; Farrell—"some sort of command," cannot recall exact words; Cornell—"I will shoot you," and did not think whoever said it was a police officer because "I will shoot you" is not an appropriate police command), but there is no dispute he yelled at least the words "I will shoot you."

5

from an unknown, armed attacker, and then tripped and fell down a steeply pitched slope through some trees, tumbling into the AIDS Memorial Grove. Standing at the top of a stairway across the meadow from where Cornell landed was Sergeant Gin. Cornell began to run toward the stairway, thinking he had found protection from the unknown assailant who had just accosted him on the High Path. To Cornell's surprise when he reached the bottom of the stairway, Sergeant Gin ordered him to stop and put his hands up.

At this point, Cornell surrendered without any protest or struggle. He raised his hands as directed, but Sergeant Gin testified that as Cornell began walking up the stairs he lowered his right hand to shoulder height, at which point Sergeant Gin drew his gun and ordered him to the ground. Cornell again complied. As he lay prone on the steps, Officers Bodisco, Brandt and Farrell arrived, and Officer Bodisco handcuffed him, with the cuffs binding his hands behind his back. Cornell remained cooperative and compliant throughout the handcuffing process.

Upon being handcuffed, Cornell was not advised he was under arrest or the basis of the arrest. None of the officers dispute, however, that he was under arrest. Having made the arrest, the officers conducted a full search incident-to-arrest. The search turned up nothing except Cornell's police identification and a standard-issue set of handcuffs in his back pocket. It was not until this point—some seven minutes after the initial encounter on Hippie Hill—that Cornell told the arresting officers he was a police officer and that he was just out for a run. When asked where his gun was, Cornell said it was in his truck, which was parked near Stowe Lake. Sergeant Gin decided at this point to take Cornell to Park Station for further interrogation. Cornell was then escorted up the steps and loaded into the back of a transport wagon, still bound in handcuffs behind his back.

As Cornell was being driven to Park Station, he began to feel light-headed, had trouble breathing, and he requested a double set of handcuffs to relieve discomfort. He repeatedly asked the driver for assistance, but was ignored. After the transport wagon left, headed for Park Station, several officers conducted a search in Golden Gate Park,

looking for incriminating evidence. They found Cornell's plaid jacket discarded in the bushes, but there was nothing in it. They also located Cornell's truck, which was parked on Conservatory Drive, some distance from Stowe Lake where Cornell said he parked it; his gun was inside, where he had indicated it could be found.

Upon arrival at Park Station, Cornell still had not been told why he was under arrest. Officers Bodisco and Brandt surreptitiously recorded an interview of him and during the questioning Officer Brandt told Cornell "[y]ou're going to end up hanging yourself pretty hard by lying. I can tell you that right now." Cornell's repeated question, "What's the charge?," went unanswered. Responding to Cornell's insistence that he had been unaware he was being pursued by police and that no officer ever issued a command to stop running, Officer Brandt accused him of being a "professional"—meaning someone who has an "extensive history of criminal misconduct" who seeks to "work the system for their benefit"—and brushed off Cornell's denial of wrongdoing with the comment, "you can talk to them downtown."

While held in custody at Park Station, Cornell was handcuffed to a bench in full view of many officers, the "entire watch" as he put it, and he overheard several of them chuckling about him being a field officer trainee, which elicited comments such as "not anymore" and "another one bites the dust." Cornell continued to report being in physical distress while at Park Station, so paramedics were called, and he was taken to a hospital. In the ambulance, while the paramedics were taking Cornell to the hospital, Officer Brandt arranged to place a hidden audio recording device near him, "because [he] might say something stupid." The recording captured nothing incriminating. At the hospital, a sample of Cornell's blood was taken and tested for the presence of narcotics. The blood draw was negative.

Upon receiving medical clearance at the hospital, Cornell was returned to Park Station, where he was eventually released at 1:50 p.m., after nearly six hours in custody. While processing him for release, Officer Brandt said to Cornell "you know the drill" and

7

handed him a misdemeanor citation accusing him of violating Penal Code section 148, subdivision (a), for resisting or delaying an officer in the course of his duties. The citation, signed by Officer Bodisco, and approved by Sergeant Gin, specified Hippie Hill as the location of the offense. No criminal charges were ever brought, but two days later, pursuant to a policy requiring termination for misconduct of any officer trainee—trainees are probationary employees—the San Francisco Police Department summarily released Cornell from its employ, ending his career as a San Francisco police officer and effectively disqualifying him from obtaining a law enforcement position with other departments or agencies.

## B.      Claims and Trial Proceedings

Cornell brought this action against Officers Brandt, Bodisco and Farrell, Sergeant Gin, San Francisco Police Chief George Gascon, and the City and County of San Francisco (the City). In his complaint, as amended, he pleaded claims for violation of Section 52.1, negligence, assault and battery, false arrest and imprisonment, and tortious interference with contract and/or economic advantage.[4] The remaining defendants at trial—and the appellants here—were Officer Brandt, Officer Bodisco, Officer Farrell, Sergeant Gin, and the City.

The case was tried to a jury over the course of 23 trial days in October and November 2013. At the close of the evidence, jury deliberations were bifurcated into two phases, with the first phase addressing the claims of assault and false arrest. A special verdict form for Phase I presented a series of 18 questions, beginning with a question asking the jury to decide whether Cornell had proved his assault claim, followed by a

---

[4] Prior to trial, the court granted summary judgment to Chief Gascon because there was no evidence of his personal involvement in the alleged acts giving rise to liability. It initially granted summary adjudication to all defendants on Cornell's Section 52.1 claim, but due to an intervening change in the applicable law, reconsidered that ruling and granted Cornell leave to amend, resulting in a second amended complaint upon which the case was tried.

8

series of 17 factual questions pertinent to the legal issue of probable cause to arrest.[5] The court adopted this bifurcated mode of submitting the case to the jury based on the expectation that the Phase I findings would dictate what, if anything, remained to be decided in Phase II.

After a day and a half of Phase I deliberations, the jury reported being "hopelessly stuck" on two of the questions submitted to it. The court admonished the jury to keep trying. Late that afternoon, a Friday, the jury again reported it was still stuck on two questions, this time adding that there was "no other testimony or evidence that will change any of our minds." With the jury at an impasse, the court recessed for the weekend, after first excusing a juror who had a schedule conflict and substituting an

[5] The specific questions, crafted jointly by the parties with input from the court, were as follows: (1) Do you find by a preponderance of the evidence that a defendant assaulted plaintiff? (2) Did either or both Officer Brandt or Bodisco see Cornell running across Sharon Meadow before they saw him on Hippie Hill? (3) Was Hippie Hill known to Officer Brandt and Bodisco as a high crime area? (4) Was it reasonable for the officers to believe that Cornell had come out of the bushes on Hippie Hill? (5) Did the officers have knowledge of the types of criminal activity in the Hippie Hill area that could lead them to believe that Cornell may be involved in criminal activity near Hippie Hill? (6) Did the officers reasonably believe that Cornell appeared nervous or evasive on Hippie Hill because of the presence of the officers? (7) Did the officers do or say anything on Hippie Hill that would have communicated to Cornell that they wanted to contact him? (8) Did the officers reasonably believe that Cornell fled from them on Hippie Hill? (9) Did the officers reasonably believe that Cornell removed his jacket to change his appearance in order to avoid detention? (10) Did the officers observe Cornell run off trail through the bushes? (11) Were Officer Brandt's only words said to Cornell, "I will shoot you!"? (12) Did Officer Brandt or Farrell do or say anything on the path above the AIDS Memorial Grove that would have communicated to Cornell that they wanted him to stop? (13) Did the officers see Cornell glance back on the path above the AIDS Memorial Grove? (14) Did the officers reasonably believe that Cornell knew or should have known that they were police officers? (15) Did Officer Farrell see Officer Brandt pointing his gun in Cornell's direction? (16) Would an objectively reasonable officer believe that Cornell ran away from Officer Brandt in order to resist the use of unreasonable force? (17) Did Cornell go down the hill into the Grove accidentally or intentionally? (18) Was it reasonable for the officers to believe that Cornell went down the hill into the Grove with the intent of evading them?

alternate juror. The reconstituted jury began deliberations anew the following week, but after two additional days of deliberating, remained hung, though on only one question. The court decided to take the Phase I verdict at that point despite the unanswered question, over an objection from the defense.[6]

In its Phase I verdict, the jury found unambiguously for the appellants on the assault claim. Beyond that, however, the results were mixed, with some findings tending to favor the officers' version of events, and some findings tending to favor Cornell's version. In the findings favorable to Cornell, the jury found that Officers Brandt and Bodisco never said anything or otherwise communicated to Cornell their desire to speak to him on Hippie Hill; that it was not reasonable for them to believe Cornell had come out of the bushes on Hippie Hill; and that, contrary to Officer Bodisco's testimony, they did not see Cornell run off trail through the bushes when he left Hippie Hill. The jury deadlocked on the question whether it was reasonable for Officers Brandt and Bodisco to believe Cornell fled from them on Hippie Hill.

In the findings favoring the defense, on the other hand, the jury found that Officers Bodisco and Brandt considered Hippie Hill to be a high crime area; that the officers' knowledge of the types of crimes committed there "could lead them to suspect" Cornell may have been engaged in criminal activity; that the officers reasonably believed that Cornell appeared "nervous or evasive" when he saw them; that they reasonably believed Cornell shed his jacket in an effort to avoid being detected; that when Officers Brandt and Farrell encountered Cornell on the High Path, they reasonably believed he knew they were police officers; that a reasonable officer would not have believed Cornell was fleeing from the use of unreasonable force against him by Officer Brandt; that, contrary

---

[6] Defense counsel objected "for the record" to this procedure and insisted upon answers to all of the Phase I special verdict questions. In a colloquy with the court when the jury first reported an impasse on November 8, counsel had previously taken the position the court had discretion to decide "what facts the Court needs to make" a probable cause determination.

10

to Cornell's testimony, he went down the hill from the High Path into the AIDS Memorial Grove intentionally, not accidentally; and that it was reasonable for the officers to believe he was trying to evade capture in doing so.

Based on the jury's Phase I findings, the court ruled as a matter of law that defendants did not have reasonable suspicion to detain Cornell and that he was arrested without probable cause. In the hiatus between Phases I and II, the defense stipulated to liability on the part of all defendants on the negligence claim, leaving only the tortious interference with economic advantage claim and the Section 52.1 claim for decision in Phase II. Moving on to the next phase of the jury deliberations, the court posed a series of Phase II questions pertaining to these two claims and to issues of causation and damages on all claims. With liability for false arrest and negligence established in Phase I, the jury returned a Phase II special verdict finding liability on the tortious interference and Section 52.1 claims,[7] awarding total damages of $575,231, including $234,007 in past economic damages, $266,224 in future economic damages, and $75,000 in past non-economic damages, with judgment entered accordingly.[8] The court then granted Cornell's motion to tax costs, awarding him $2,027,612.75 in attorney's fees under Section 52.1.

These timely appeals followed, from the judgment and from the attorney's fee award.

---

[8] In the Phase II verdicts, the jury found liability against only Officers Brandt and Bodisco on the intentional interference claim and against only Officer Brandt and Sergeant Gin on the Section 52.1 claim. Based on the verdicts for Phase I and Phase II and on the stipulation by all appellants to liability for negligence, judgment was entered against all appellants on the false arrest claim and the negligence claim, against Officer Brandt, Sergeant Gin and the City on the Section 52.1 claim, against Officers Brandt and Bodisco on the intentional interference with economic relations claim, and in favor of all appellants on the assault claim. The judgment awards the total damages jointly and severally against all appellants.

11

## II.  DISCUSSION

### A.  Probable Cause to Arrest

Where the facts are not in conflict, the issue of probable cause is a question of law reviewable de novo on appeal. (*Giannis v. City and County of San Francisco* (1978) 78 Cal.App.3d 219, 225; *People v. Tyler* (1961) 193 Cal.App.2d 728, 735.)  We look to whether facts known to the arresting officer "at the moment the arrest was made" (*Beck v. Ohio* (1964) 379 U.S. 89, 90) " 'would persuade someone of "reasonable caution" that the person to be arrested has committed a crime.' " (*People v. Zaragoza* (2016) 1 Cal.5th 21, 57; see *Dunaway v. New York* (1979) 442 U.S. 200, 208, fn. 9.)  "The rule of probable cause is a practical, nontechnical conception" that turns on an assessment of the facts gathered by the arresting officer in the field (*Brinegar v. United States* (1949) 338 U.S. 160, 176) and is not governed by courtroom standards of proof.  (*Ibid.*)  Many verbal formulae have been used to describe it, but distilled to their essence " '[t]he substance of all the definitions . . . is a reasonable ground for belief of guilt' " (*id.* at p. 175), where the belief is "particularized with respect to the person to be . . . seized." (*People v. Thompson* (2006) 38 Cal.4th 811, 818.)

The legal standard we apply to assess probable cause is an objective one in which the subjective motivations of the arresting officers have no role.  (*Whren v. United States* (1996) 517 U.S. 806, 813; *Gillan v. City of San Marino* (2007) 147 Cal.App.4th 1033, 1045 (*Gillan*); *Johnson v. Lewis* (2004) 120 Cal.App.4th 443, 454.)  But it is an overstatement to say that what is in the mind of an arresting officer is wholly irrelevant, for the objective test of reasonableness is simply a measure by which we assess whether the circumstances as subjectively perceived by the officer provide a reasonable basis for the seizure.  (*Agar v. Superior Court* (1971) 21 Cal.App.3d 24, 29; see *Devenpeck v. Alford* (2004) 543 U.S. 146, 153.)

Of course, temporary detention on grounds short of probable cause is also constitutionally permissible in some circumstances.  (*Terry v. Ohio* (1968) 392 U.S. 1, 20–21, 27.)  A "brief, investigatory stop" is justified where an officer has "reasonable, articulable suspicion that criminal activity is afoot," implicating the suspect.  (*Illinois v.*

12

*Wardlow* (2000) 528 U.S. 119, 123 (*Wardlow*); see *In re Tony C.* (1978) 21 Cal.3d 888, 893.) While the more demanding standard of probable cause requires a basis to suspect someone of having committed a particular crime, reasonable suspicion to detain only requires facts connecting the suspect to "criminal activity" more generally. (*People v. Campbell* (1981) 118 Cal.App.3d 588, 594.) Like the probable cause determination, the applicable test courts use to assess reasonable suspicion is an objective one, specific to the detainee. (*People v. Perrusquia* (2007) 150 Cal.App.4th 228, 233.)

Our Supreme Court recently explained that " '[a] detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity.' [Citation.] Such reasonable suspicion cannot be based solely on factors unrelated to the defendant, such as criminal activity in the area." (*People v. Casares* (2016) 62 Cal.4th 808, 837–838 (*Casares*).) Reasonable suspicion must rest on objective particulars tying a particular person to criminal activity, rather than on a mere "hunch" that something is odd or unusual about the person detained. (*Id.* at p. 838; see *People v. Bower* (1979) 24 Cal.3d 638, 647 [officer's suspicions about white man found late at night in a "high crime," largely black neighborhood insufficient to justify detention where the officer testified he had never seen a white person in that area at that time "for an innocent purpose"].)

Cornell was arrested for the offense of "willfully resist[ing], delay[ing], or obstruct[ing] [a] . . . peace officer . . . in the discharge . . . [of a] duty of his or her office" under Penal Code section 148, subdivision (a). To violate this statute, the obstructive conduct must impede the *lawful* performance of an officer's duty. (*People v. Curtis* (1969) 70 Cal.2d 347, 354; *People v. Rodriguez* (2012) 207 Cal.App.4th 1540, 1543.) Thus, the analysis here focuses, at its core, on whether there was reasonable suspicion justifying Cornell's detention at any point between the time he was spotted on Hippie Hill and the time he was arrested in AIDS Memorial Grove. If there was not, Officers Brandt and Bodisco—and their fellow officers, since all of the officers involved in pursuing Cornell constructively shared the same pool of information under the collective

knowledge doctrine[9]—were acting outside the lawful course of their duties when they sought to detain him. That analysis drives the probable cause analysis, for if there was no objectively reasonable basis to believe Cornell had violated Penal Code section 148, subdivision (a) or any other law, probable cause to arrest was lacking as well. (*Casares*, *supra*, 62 Cal.4th at p. 838 ["The detention being unlawful, the subsequent searches of defendant's person and the car he had been sitting in were also unlawful."].)

We agree with the trial court that there was no reasonable suspicion to detain and hence no probable cause to arrest. This incident took place in broad daylight in one of the most heavily used public recreation areas in San Francisco. The jury found that when the chase commenced, Officers Brandt and Bodisco knew little more than that they had seen Cornell at a location where drug crimes often took place, but with nothing connecting him to any criminal activity. The man had nothing in his hands, made no furtive movements, and was speaking to no one. Nothing about the way he was dressed indicated he might be hiding something under his clothing, and Officers Brandt and Bodisco gave him no directions that he disobeyed. (See *Casares*, *supra*, 62 Cal.4th at p. 838 ["[officer] described no furtive movement or other behavior by defendant suggestive of criminal activity"].) They did not claim they recognized Cornell as someone with previous involvement in criminal activity. They had no tip that a drug transaction was about to take place in which he fit the description of someone likely to be involved. And they saw no activity on Hippie Hill, by anyone, indicating that drug activity was *currently* taking place or about to take place there.

On the strength of testimony from Officer Bodisco that Cornell "looked worried" and avoided making eye contact with him and his partner, the jury found the officers reasonably believed Cornell seemed "nervous or evasive." But " '[l]ooking at a police officer and then looking away does not provide the officer with "a particularized and objective basis for suspecting the person stopped of criminal activity." ' " (*People v. Pitts* (2004) 117 Cal.App.4th 881, 888.) "In general, although eye contact, or the lack thereof, may be considered as a factor establishing reasonable suspicion, . . . whether the

---

[9] See, e.g., *People v. Ramirez* (1997) 59 Cal.App.4th 1548, 1552–1556.

14

contact is suspicious or not 'is highly subjective and must be evaluated in light of the circumstances of each case.' [Citations.] The skepticism with which this factor is treated is in large part due to the fact that reliance upon 'suspicious' looks can so easily devolve into a case of damned if you do, equally damned if you don't. [Citations.] Accordingly, . . . that factor is 'of questionable value . . . generally.' " (*United States v. Montero-Camargo* (9th Cir. 2000) 208 F.3d 1122, 1136.)

The jury's finding that the officers' knowledge of Hippie Hill as a hotspot for crime "could lead them to suspect that Cornell may be involved in criminal activity" was equally true of anyone else in the vicinity. Because these two officers had insufficient information to do anything more than seek a consensual encounter with Cornell as they watched him on Hippie Hill (see *Casares*, *supra*, 62 Cal.4th at p. 838 ["when . . . officer initiated the identification procedure, . . . he had no factual basis for a reasonable suspicion, as opposed to a mere hunch, that defendant was then engaged in any criminal activity"]), the critical sequence of events took place when the chase began. At that point, as Officers Brandt and Bodisco turned their car toward Cornell—without saying anything over their loudspeaker or otherwise signaling an intent to approach—Cornell was already walking away, which he was entitled to do. (See *People v. Souza* (1994) 9 Cal.4th 224, 234 (*Souza*) ["a person approached by police for questioning may decline to answer the questions and 'may go on his way' "].) Even assuming Cornell was deliberately trying to avoid Officers Brandt and Bodisco as he ran off, that did not change things. Not every effort to avoid an encounter with police warrants detention. If it did, anyone who turns off the freeway in haste after spotting a police car in the rearview mirror could be stopped for trying to avoid being pulled over.

Pointing to the fact Cornell shed his jacket after starting to run, a move the jury found gave Officers Brandt and Bodisco reasonable grounds to believe he was trying to "avoid detection," appellants emphasize that *evasive* flight can provide reasonable suspicion, especially when the experience of officers with crime in a particular area connects a fleeing person to illicit activity. It is true that, in a high crime area, "unprovoked flight upon noticing the police" may provide reasonable suspicion in some circumstances (*Wardlow*, *supra*, 528 U.S. at p. 124), and that "headlong flight wherever

15

it occurs"—which can be considered the "consummate act of evasion"—will justify a stop. (*Ibid*.) But the High Court has declined to adopt a " 'bright-line rule' authorizing the temporary detention of anyone who flees at the mere sight of a police officer." (*Id*. at p. 126 (conc. & dis. opn. of Stevens, J.)), favoring instead a totality of the circumstances approach that requires consideration of flight along with other objective indicators connecting a suspect to criminal activity. (See also *Souza*, *supra*, 9 Cal.4th at p. 239 ["No single fact—for instance, flight from approaching police—can be indicative in *all* detention cases of involvement in criminal conduct. Time, locality, lighting conditions, and an area's reputation for criminal activity all give meaning to a particular act of flight, and may or may not suggest to a trained officer that the fleeing person is involved in criminal activity. Consequently, a 'bright-line' rule applicable to all investigatory stops . . . would be improper."].)

What is important here is whether the circumstances known to the officers, in totality, connected Cornell to suspected criminal activity, not whether, as a standalone matter, they perceived him to be fleeing from them when he began to run. The jury made no finding, and there was no evidence, that Cornell was carrying something Officers Brandt and Bodisco thought could be contraband and discarded it as he ran. Nor was there any finding that Cornell was desperate, panicked or in "[h]eadlong flight" (*Wardlow*, *supra*, 528 U.S. at p. 124), suggesting consciousness of guilt. The special verdict questions bearing on *how* Cornell ran, to be sure, are somewhat ambiguous, but in interpreting them—after considering the same evidence the jury did—the trial court's ultimate legal conclusion shows it read the findings as accepting Cornell's version of what happened at the start of the chase (after a "cool down" break he resumed his run along a pedestrian path, removed his jacket while running, and took enough time along the path to fold it and place it on a nearby stump), rather than the officers' version (he suddenly broke into a "full blown sprint," ran off-trail, and "dumped" his jacket while running through the bushes).[10] Because the findings suggest the jury saw key details in

---

[10] The trial court's function is to draw legal conclusions from the facts found by special verdict (Code Civ. Proc., § 624), and, unless the findings are incomplete,

16

the officers' reported perceptions of Cornell at this crucial juncture as embellishments, we see no reason to disagree that the more benign view of the facts known to them is the best interpretation of what the jury found.[11]

Appellants rely heavily on *People v. Rodriguez, supra*, 207 Cal.App.4th 1540, where a man jumped from a car and ran from an officer who was attempting to make a stop. Another officer who heard a radio broadcast about the fleeing suspect saw him a minute later, walking nearby. The second officer shined a spotlight on the suspect and got out of his patrol car, at which point the suspect sprinted away, crossing traffic lanes, reaching into his pocket while he ran, and then throwing an item over a chain-link fence. Upon being chased down and detained, the suspect admitted he "knew he was running from a police officer" but ran because he had "an outstanding warrant and a digital scale in his pocket." (*Id.* at p. 1543.) On these facts the court concluded there was more than enough justification to detain, closing its opinion with the remark, "This is not a case where appellant was *out for an evening jog.*" (*Id.* at p. 1544, italics added.) Here, nothing contradicts Cornell's testimony that he was, in fact, out for a jog. Nor are there any of the particulars we see in *Rodriguez*, where the officers had cause to detain at the outset—in the traffic stop—which led the suspect to flee at a full sprint, putting himself at risk in traffic while he ran.

Shifting their focus slightly, appellants point to Cornell's later actions on the High Path, where he defied an order to stop and launched into a sprint through the woods with

---

inconsistent or "hopelessly ambiguous"—which is not the case here—the court may interpret the verdict in view of the pleadings, evidence and instructions. (*Woodcock v. Fontana Scaffolding & Equipment Co.* (1968) 69 Cal.2d 452, 456–457 [trial judge's function is to interpret the verdict " 'from its language considered in connection with the pleadings, evidence and instructions' "; if trial court's interpretation is incorrect, appellate court will interpret the verdict if it is possible to give a correct interpretation].) We review any such interpretation de novo. (*Ibid.*)

[11] The jury answered "No" to Question No. 10, which indicates it did not find credible the testimony from Officer Bodisco that Cornell ran off-trail through the bushes, consistent with its earlier "No" response to Question No. 4, indicating it had also rejected the officers' testimony that they believed Cornell emerged from the bushes at the top of Hippie Hill when they first saw him.

17

desperate abandon, scrambling down the side of a hill into the AIDS Memorial Grove. This sequence of events on the High Path, they say, was part of a fluid series of events leading up to the moment of arrest. By then, appellants contend, the jury's findings establish without doubt that Cornell was in full flight, clearly indicating consciousness of guilt. They argue that, given the evolving nature of the situation, we must not limit the question to what Officers Brandt and Bodisco knew at the outset of the chase, but must consider all the circumstances known to them prior to Cornell's surrender. We agree, but the problem for appellants is that what happened on the High Path was provoked. The jury's finding that Officers Brandt and Farrell reasonably perceived Cornell to be running away from them at that point does not negate the obvious: Foolishly or not, Cornell ran away at the point of a gun and a threat of "I will shoot you." Other than this panicked reaction—which Officer Brandt brought about—there was no greater cause to detain Cornell on the High Path than there was on Hippie Hill.[12]

Granted, the better and certainly the safer course for Cornell was to surrender on the High Path, but in order for his defiance to constitute a violation of Penal Code section 148, Officers Brandt and Farrell still had to be acting in the lawful performance of their duties, which places the focus back on what happened at the beginning of the chase. Because Officers Brandt and Bodisco did not have reasonable suspicion to detain in the first place, the trial court properly concluded that none of the appellant officers acted in the lawful course of his duties at later points in time. Thus, when Cornell darted away on the High Path, it made no difference whether he took off out of fright, still unaware he was being chased by police officers (as he claims), or out of a desire not to be caught, despite having looked straight at two uniformed officers, in defiance of their command to

---

[12] We might have been inclined to conclude otherwise if the jury had found that Cornell, in reaction to a command from Officer Brandt to stop, had committed some crime posing a threat to any of the appellant officers or to the public. Under *Brown v. Illinois* (1975) 422 U.S. 590, that would have attenuated the taint of the unjustified attempt to detain him. But merely fleeing on foot from a show of force does not bring *Brown* doctrine into play. (*United States v. Brodie* (D.C. Cir. 2014) 742 F.3d 1058, 1063 [*Brown* attenuation doctrine not applicable where detainee, in response to officers' orders to put his hands on car hood preparatory to a search of his person, "fled on foot, and the manner of his flight in itself posed no incremental threat to anyone"].)

stop (as the officers claim). Officer Brandt chased down and trained a weapon on a running man about whom he knew virtually nothing, except that this was someone who had the temerity to try to elude capture. Without something objectively tying him to criminal activity, we conclude that none of the appellant officers had a legal basis to detain—much less probable cause to arrest—on Hippie Hill, on the High Path, or in AIDS Memorial Grove.

### B. Incomplete Phase I Special Verdict

In addition to claiming there was reasonable suspicion to detain and thus probable cause to arrest, appellants challenge the Phase I verdict on procedural grounds. After many days of deliberation in Phase I, and after the jury had sent multiple messages to the court asking about specific questions posed on the Phase I Verdict Form, and after repeatedly reporting an inability to reach a verdict on a number of those questions, the jury finally managed to reach a verdict on all but one question, Question No. 8. Appellants argue that this question—which asked the jury to find whether Officers Brandt and Bodisco reasonably believed Cornell was fleeing from them when he began running on Hippie Hill—was so material to the issue of reasonable suspicion that it was reversible error to accept the Phase I verdict without an answer to it. On that basis, they contend it was an abuse of discretion to deny their motion for a mistrial. We cannot agree.

Even assuming the acceptance of an incomplete Phase I Verdict Form was error, we do not see the factual issue presented by Question No. 8 as so material to the total mix of facts that it would have changed the outcome on the issue of reasonable suspicion had it been decided in favor of appellants. Cornell would have been entitled to walk away had the officers approached him on Hippie Hill, as we note above. Our analysis of the circumstances when he left Hippie Hill assumes Officers Brandt and Bodisco did perceive he ran from them, as they testified, and as Question No. 8 asked the jury to find, but even granting that assumption we do not think the totality of what they knew at that stage points to anything more than a hunch that he could have had some connection to criminal activity on Hippie Hill. We thus conclude the court did not abuse its discretion by denying appellants' motion for a mistrial. (See *Blumenthal v. Superior Court* (2006)

137 Cal.App.4th 672, 679 [" 'A trial court should *grant* a mistrial *only* when a party's chances of receiving a fair trial have been irreparably damaged, and we use the deferential abuse of discretion standard to review a trial court ruling *denying* a mistrial.' "])

### C. Statutory Immunity Under Penal Code Section 847, Subdivision (b)

Next, appellants argue we should reverse because the trial court never "specifically addressed" whether the appellant officers are statutorily immune for the false arrest of Cornell. Penal Code section 847, subdivision (b) provides that "[t]here shall be no civil liability on the part of, and no cause of action shall arise against, any peace officer . . . , acting within the scope of his or her authority, for false arrest or false imprisonment arising out of any arrest" under specified circumstances, and one of those circumstances, set forth in subdivision (b)(1), is that "[t]he arrest was lawful, or the peace officer, at the time of the arrest, had reasonable cause to believe the arrest was lawful."

We see no error here either. California courts speak of "reasonable cause" and "probable cause" interchangeably (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069; *O'Toole v. Superior Court* (2006) 140 Cal.App.4th 488, 510), and appellants cite no case recognizing any meaningful distinction in the two phrases. The statutory scheme of which Penal Code section 847 is part,[13] much of which was enacted in 1872 as part of the Field Code, uses both terms without differentiation, and the few cases that apply subdivision (b)(1)—which first appeared in language added by amendment in 1957[14]— give no separate consideration to its reach after completing their analyses of probable cause. (See *O'Toole,* at pp. 511–513; *Hamilton v. City of San Diego* (1990) 217 Cal.App.3d 838, 844 (*Hamilton*).) Thus, the trial judge here was not alone in perceiving no need to undertake an analysis of appellants' statutory immunity argument, separate from her probable cause analysis.

---

[13] Penal Code Part 2, Title 3, Chapter 5, section 833 et seq.

[14] Statute 1957, chapter 2147, section 5, page 3806; Assembly Bill No. 1857, approved by Governor July 8, 1957 (1957 Reg. Sess.).

20

While novel, appellants' argument has worthy bona fides. It is based on a reading of the language of Penal Code 847, subdivision (b), that was first advocated in 1963 by the eminent scholar of governmental immunity in California, Professor Arvo Van Alstyne. Focusing his attention on the fact that the statute, by its literal terms, affords immunity for false arrest if "the arrest was lawful, *or* the peace officer, at the time of the arrest, had reasonable cause to believe the arrest was lawful" (italics added), Professor Van Alstyne argued that the disjunctive phrase "reasonable cause to believe" would be surplusage if it did not defeat liability for unlawful arrests as well as lawful ones. (See "A Study Relating to Sovereign Immunity" (Jan. 1963) 5 Cal. Law Revision Com. Rep. (1963), at pp. 407–408 (1963 Van Alstyne Study).) To trigger the protection of the statute, he argued, an officer should only be required to show he *in fact* believed the arrest was justified. (*Id.* at p. 408.)[15]

Giving a modern twist to what was, in effect, a call for immunity by Professor Van Alstyne based on a standard of subjective good faith, appellants suggest we read into Penal Code section 847, subdivision (b), the federal standard for qualified immunity that has evolved in the last three decades, which is based on an objective appraisal of whether an officer facing civil suit violated "clearly established" law, and is not simply a test of subjective good faith. (See *Estate of Lopez v. Gelhaus* (9th Cir. 2017) 871 F.3d 998, 1005, 1017–1018.) This immunity doctrine, developed by the federal courts in the context of Fourth Amendment claims under 42 U.S.C. section 1983 (Section 1983), deriving it from the common law with no statutory foundation, is purely judge-made. (*Anderson v. Creighton* (1987) 483 U.S. 635, 645 (*Anderson*); see *Harlow v. Fitzgerald*

---

[15] "At the Legislature's request, the California Law Revision Commission submitted a comprehensive report in 1963, which gave rise to the statutory system that now governs the field of public entity tort liability. . . .[¶] Professor . . . Van Alstyne was the California Law Revision Commission's chief consultant and much of his work gave rise to the present statutory system." (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 229 (conc. opn. of Baxter, J.) "The 1963 study was authored by Professor . . . Van Alstyne and represented [his] views . . . and not necessarily those of the Law Revision Commission. (1963 Van Alstyne Study, *supra,* 5 Cal. Law. Revision Com. Rep. at p. 5, fn.*.)" (*Property Reserve, Inc. v. Superior Court* (2016) 1 Cal.5th 151, 182, fn. 10.)

(1982) 457 U.S. 800, 813-819; *Pierson v. Ray* (1967) 386 U.S. 547, 557.)  Citing *Venegas v. County of Los Angeles* (2007) 153 Cal.App.4th 1230 (*Venegas II*),[16] Cornell contends the federal common law doctrine of qualified immunity "does not apply at all to state law claims, specifically false arrest claims," but he never specifically engages with appellants' reading of the text of section 847, subdivision (b).

Cornell is correct that *Venegas II* held that the federal qualified immunity "does not apply to actions brought under . . . [S]ection 52.1" (153 Cal.App.4th at p. 1246), but the appellate panel in that case took care to mention it was not addressing "whether a statutory immunity might apply." (*Ibid.*)  We understand appellants to be taking up the issue left open there, using Penal Code section 847 as the statutory basis for their argument, while, in effect, bringing in federal qualified immunity, so to speak, "through the back door."  Even if we were receptive to the idea of introducing federal qualified immunity into California law in this fashion despite the holding in *Venegas II*—we are not, since we view that opinion as soundly reasoned—we reject the premise that Penal Code section 847, subdivision (b)(1) adds an extra layer of protection beyond what is already afforded by the doctrine of probable cause.  Because nothing in the statutory scheme for official immunity in California alters the rule that "[u]nder California law, a police officer is not granted governmental immunity for false arrest and imprisonment" (*O'Toole*, *supra*, 140 Cal.App.4th at p. 510), we see no basis to borrow the federal rule of qualified immunity absent specific legislative authorization.

We do not agree that Penal Code section 847 provides that authorization. Subdivision (b)(1) of Penal Code section 847 is coextensive with the doctrine of probable cause (*Hamilton*, *supra*, 217 Cal.App.3d at p. 846), but goes no further.  Since at least the

---

[16] *Venegas II* is one of a series of appellate opinions arising out of a suit brought by plaintiff David Venegas against the County of Los Angeles and various deputies of the Los Angeles Sheriff's Department seeking damages in connection with his alleged wrongful detention and arrest.  It was decided on remand following the California Supreme Court's opinion in *Venegas v. County of Los Angeles* (2004) 32 Cal.4th 820, 843 (*Venegas*), which, as we discuss below, is central to our analysis of the appellant's claim of error in connection with the Section 52.1 verdict here.

22

early 1950s, it has been settled that a "police officer who makes an arrest without a warrant and without justification may be held civilly liable for false arrest and imprisonment." (*Dragna v. White* (1955) 45 Cal.2d 469, 471 (*Dragna*).)[17] When the language of Penal Code section 847, subdivision (b) was added to the Penal Code by amendment in 1957, nothing in the legislative history suggests it was intended to reverse or supersede *Dragna*. Quite to the contrary, what little discussion there was of this specific amendment as Assembly Bill No. 1857 moved through the Legislature indicates it was understood as a codification of then-existing law. (See Sen. Interim Judiciary Com. (1955–1957), Fourth Progress Report to the Legislature, Rep. on Assem. Bill No. 1857, at p. 427 [Senate Interim Judiciary Committee Report], quoting statement of the District Attorneys Association concerning Assembly Bill No. 1857 ["[t]his bill seeks to amend the Penal Code sections on arrest—to make them reflect the law of arrest as declared and interpreted by the appellate courts of California—and to incorporate parts of the Uniform Arrest Act, with the intention that the statutory law of California shall be a

---

[17] (See also *Miller v. Glass* (1955) 44 Cal.2d 359, 363; *Hughes v. Oreb* (1951) 36 Cal.2d 854.) Even in their era, the *Dragna* line of cases did not break new ground. They simply applied in the setting of unlawful arrest and false imprisonment the firmly rooted common law principle that where a law enforcement officer engages in tortious acts within the scope of his office, he is acting under color of law—meaning under pretense of legal authority, even though his acts are illegal—and thus he may be held liable in tort. (*Abbott v. Cooper* (1933) 218 Cal. 425, 432 ["[W]here a person holding the office of sheriff or constable does acts *colore officii*, though he had no sufficient warrant to do the act, he is responsible to third persons in an action for a breach of official duty. Such a rule is declared to be supported by the weight of authority."]; see Steven L. Winter, *The Meaning of "Under Color of" Law* (1992) 91 Mich. L.Rev. 323, at pp. 342–346 [common law origins of the concept of extra-legal official conduct undertaken "under color of law"].) The same concept has long been accepted in law enforcement misconduct cases under federal civil rights law. (*Monroe v. Pape* (1961) 365 U.S. 167, 181–187, overruled on other grounds in *Monell v. Department of Social Services of City of New York* (1978) 436 U.S. 658.)

23

true, accurate and concise guide to the substantive rights and duties of peace officers and citizens alike"]; *id*. at p. 430 [citing *Dragna* as established law]).[18]

The surplusage argument on which appellants' proffered interpretation of Penal Code section 847 hinges, echoing Professor Van Alstyne, is not persuasive. The legislative history makes clear why section 847, subdivision (b) uses the disjunctive in referring to a "lawful" arrest "or" an arrest made on "reasonable cause to believe the arrest was lawful." The alternative "reasonable cause" scenario tracks a secondary holding of the *Dragna* case, which addresses liability for unreasonably prolonged jail detention prior to arraignment. (See *Dragna*, *supra*, 45 Cal.2d at p. 473 ["where the arrest is lawful, subsequent unreasonable delay in taking the person before a magistrate will not affect the legality of the arrest, although it will subject the offending person to liability for so much of the imprisonment as occurs after the period of necessary or reasonable delay."].) Thus, the Senate Interim Judiciary Committee Report, citing *Dragna*, explains that, "present legal thinking [citation] indicates that while an arrest, based upon reasonable cause, is lawful, . . . a subsequent detention could be unlawful. Such would be the case if after arrest, but before the arraignment, the arresting officer

---

[18] In response to the California Supreme Court's landmark decision recognizing the exclusionary rule in *People v. Cahan* (1955) 44 Cal.2d 434, Assembly Bill 1857 was an effort to update and clarify the statutory rules governing arrest in California. (Senate Interim Judiciary Committee Report at pp. 437, 439; see House Resolution No. 184 (May 19, 1955) [discussing *Cahan* as the impetus for the bill].) Objections to Assembly Bill No. 1857 focused primarily on the fact that, for the first time, broad legislative recognition was being given to the power of warrantless detention in circumstances short of arrest. (See Senate Interim Judiciary Committee Report at pp. 445–447 [quoting comments of the State Bar of California conveyed by letter dated June 4, 1957 from Joseph A. Ball, State Bar President, to Hon. Patrick D. McGee, Chairman of the Assembly Judiciary Committee and sponsor of Assem. Bill No. 1857].) On our own motion, under Evidence Code sections 452, subdivision (c) and 459, we take judicial notice of the above-cited legislative history materials, since committee reports and legislative resolutions are "indicative of the intent of the Legislature as a whole." (*Metropolitan Water Dist. v. Imperial Irrigation Dist.* (2000) 80 Cal.App.4th 1403, 1425, italics omitted (*Metropolitan Water*).)

learn[s] of facts which destroy[] the belief upon which his reasonable cause was based." (Senate Interim Judiciary Committee Report, *supra,* at p. 430.)

Understood within the context provided by the legislative history, therefore, the reference to both "lawful arrest" and arrest on "reasonable cause" in section 847, subdivision (b)(1), is not surplusage. It is simply descriptive of the two-part holding in *Dragna* that the Legislature recognized as foundational. Shorn of its textual premise, the policy rationale for Professor Van Alstyne's reading of the statutory language—that peace officers should have protection from civil liability for arrests made upon reasonable mistake—is already fundamental to the modern concept of probable cause and its close cousin reasonable suspicion. Without clear and definite legislative authorization, we are not inclined to announce that, after all these years, we have discovered in section 847, subdivision (b) an additional layer of protection from civil liability beyond what already exists through the doctrine of probable cause, or to use section 847 as the statutory basis for importing federal qualified immunity into California law.[19]

### D.  Section 52.1 Claim

#### 1.  *The Bane Act*

On the recommendation of a commission appointed by then Attorney General John Van de Kamp, the Tom Bane Civil Rights Act (Stats.1987, ch. 1277, §§ 3–4,

---

[19] It is worth noting that the High Court's decision to create for law enforcement officers the added level of protection against Section 1983 liability provided by the doctrine of qualified immunity was announced by a closely divided 5-4 vote, over a vigorous dissent from Justice Stevens, who pointed out that such an immunity is unnecessary because "the probable-cause standard itself recognizes the fair leeway that law enforcement officers must have in carrying out their dangerous work. The concept of probable cause leaves room for mistakes, provided always that they are mistakes that could have been made by a reasonable officer." (*Anderson*, *supra*, 483 U.S. 635, 661 (dis. opn. of Stevens, J.); *id.* at p. 659 [referring to the new rule as a "double standard of reasonableness"].) And as recently as this past High Court term, sharp criticism of the qualified immunity doctrine from at least one current member of the Court has been expressed. (See *Ziglar v. Abbasi* (2017) 582 U.S. __, 137 S.Ct. 1843, 1871 (conc. opn. of Thomas, J.) ["Our qualified immunity precedents . . . represent precisely the sort of 'freewheeling policy choice[s]' that we have previously disclaimed the power to make."].)

25

pp. 4544–4548) (the Bane Act) was enacted in 1987 "as part of a comprehensive package of legislation to combat hate crimes." (*Venegas II*, *supra*, 153 Cal.App.4th at p. 1242.)[20] The Bane Act is enforceable criminally, under Penal Code section 422.6 (*In re M.S.* (1995) 10 Cal.4th 698, 713, 715), and civilly, under Section 52.1 (*Jones v. Kmart Corp.* (1998) 17 Cal.4th 329 (*Jones*).) While Penal Code section 422.6 is focused specifically on hate crimes as conventionally understood (i.e. acts of violence or intimidation aimed at members of statutorily protected groups), Section 52.1 sweeps much more broadly, protecting against all conduct aimed at " 'interfer[ing]' " with rights " 'secured by' " the constitutional or statutory law of the United States, or of California, where the interference is carried out "by threats, intimidation or coercion," whether or not the offending conduct is motivated by discriminatory animus. (*Venegas*, *supra*, 32 Cal.4th at p. 843.)[21]

The centerpiece of civil enforcement under the Bane Act is subdivision (a) of Section 52.1, which provides, "If a person or persons, whether or not acting under color

[20] (See Attorney General's Com. on Racial, Ethnic, Religious and Minority Violence, Final Report (April 1986) (Final Report of the Van de Kamp Commission); Assem. Bill No. 63 (1987–1988 Reg. Sess.); Letter from John H. Van de Kamp to Hon. Larry Stirling, Chairman, Assembly Public Safety Committee (March 18, 1987) ["This bill implements the recommendations of the Attorney General's Commission on Racial, Ethnic, Religious and Minority Violence . . . ."].) Attorney General Van de Kamp's letter to Chairman Stirling is included in the Assembly Public Safety Committee's bill file for Assembly Bill No. 63. On our own motion, under Evidence Code sections 452, subdivision (c) and 459, we take judicial notice of the Final Report of the Van de Kamp Commission as well as the Van de Kamp letter to Chairman Stirling. (See *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 842, fn. 3 [judicial notice of Attorney General's report on gasoline pricing proper as an official act of executive department for use as background material]; *Varshock v. Department of Forestry & Fire Protection* (2011) 194 Cal.App.4th 635, 647 ["The report of a commission that proposes a statute subsequently adopted is given 'substantial weight' in construing the statute . . . ."].)

[21] The use of parallel criminal and civil enforcement mechanisms follows the pattern of post-Civil War federal civil rights legislation. (See 18 U.S.C. § 241 [Section 241] and 18 U.S.C.§ 242 [Section 242], two criminal statutes which were enacted as sections 6 and 17 of the Enforcement Act of 1870, and their civil counterpart statutes, respectively, 42 U.S.C. § 1985(3) (Section 1985(3)) and Section 1983, which were

26

of law, interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, the Attorney General, or any district attorney or city attorney may bring a civil action for injunctive and other appropriate equitable relief in the name of the people of the State of California, in order to protect the peaceable exercise or enjoyment of the right or rights secured. . . ." Private actions by aggrieved individuals are authorized under Section 52.1, subdivision (b), which provides for recovery of compensatory and punitive damages, injunctive relief, civil penalties, and attorney's fees. "The creation of civil causes of action by victims of . . . conduct" in violation of Section 52.1 is central to the Bane Act's enforcement scheme. (*Stamps v. Superior Court* (2006) 136 Cal.App.4th 1441, 1448 [legislative history shows private actions intended to be "at the heart of the legislation"].)

Claims may be brought under Section 52.1, subdivision (a), against rights-interfering conduct by private actors as well as by public officials (*Jones*, *supra*, 17 Cal.4th at p. 338), including police officers (*Simmons v. Superior Court* (2016) 7 Cal.App.5th 1113 (*Simmons*)). The word "interferes" as used in Section 52.1 has been construed as "violates." (See *Jones, supra,* 17 Cal.4th at p. 338 [California Supreme Court equates "interfere" with "violate"].) " 'The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., "threats, intimidation or coercion"), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law.' " (*Simmons*, at p. 1125; accord, *Austin B. v. Escondido Union School Dist.* (2007) 149 Cal.App.4th 860, 883.)

---

enacted as section 19 of the Civil Rights Act of 1875 and section 2 of the Ku Klux Klan Act of 1871. (See Eugene Gressman, *The Unhappy History of Civil Rights Legislation* (1952) 50 Mich L.Rev. 1323, 1333–1334; Frederick M. Lawrence, *Civil Rights and Criminal Wrongs: The Mens Rea of Federal Civil Rights Crimes* (1993) 67 Tul. L.Rev. 2113, 2135–2145 & Appendices [tracing the Post-Civil War civil rights statutes as originally enacted through various recodifications in the United States Code].)

The model for Section 52.1 is a similarly worded Massachusetts statute, Massachusetts Civil Rights Act of 1979 (Mass. Gen. Laws Ann., ch. 12, §§ 11H, 11I) (MCRA). (*Jones, supra,* 17 Cal.4th at p. 335.) Some courts interpreting and applying the MCRA and Section 52.1 have concluded, without close examination, that these respective statutes are state law analogues to Section 1983. (See *Cameron v. Craig* (9th Cir. 2013) 713 F.3d 1012, 1022 ["[T]he elements of the excessive force claim under § 52.1 are the same as under § 1983."]; *Batchelder v. Allied Stores Corp.* (1985) 393 Mass. 819, 822–823 [473 N.E.2d 1128, 1131] ["the Legislature intended to provide a remedy under [MCRA], coextensive with 42 U.S.C. § 1983 . . . , except that the Federal statute requires State action whereas its State counterpart does not"].) In a broad conceptual sense, that is true, since both Section 52.1 and the MCRA are supplements to Section 1983, providing state law civil remedies for violation of constitutional and statutory rights protected by federal as well as state law. But the most similar federal civil rights statute to Section 52.1, textually and structurally—similar enough to suggest that it, not Section 1983, was the original template our Legislature drew from—is Section 241. (See Final Report of the Van de Kamp Commission, Chptr. 3, "Proposed California Civil Rights Act," at p. 23 & p. 24, fn. 4 ["The Massachusetts Civil Rights Act is patterned after federal civil rights statutes that protect rights guaranteed by federal laws and the Constitution," citing to Section 241, with no mention of Section 1983].)[22]

_____

[22] While the citation to Section 241 in the Final Report of the Van de Kamp Commission provides fairly clear evidence of the genesis of Section 52.1, the language of Section 52.1 is also traceable to Section 241 by direct comparison. Section 52.1 adopts the signature structure of Section 241, which prohibits interference with the "free exercise" or "enjoyment" of a broadly-defined class of "secured" civil rights. And Section 52.1, like Section 241, targets the use of fear-inducing conduct to carry out the interference. Where Section 52.1 prohibits "interfere[nce]" by "threats, intimidation or coercion," Section 241 prohibits attempts to "injure, oppress, threaten, or intimidate" someone in the exercise of protected rights. In addition, the modern adaptation of Section 241's rights-interference structure in other federal legislation can be seen in the Voting Rights Act of 1965, which uses language nearly identical to that of Section 52.1. (See 52 U.S.C. § 10101(b) ["No person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other

## 2. *Appellants' Contentions*

Appellants argue we should reverse the finding for Cornell on his Section 52.1 claim along with the accompanying award of statutory attorney's fees because there was insufficient evidence to submit that claim to the jury. This attack on the Section 52.1 verdict here is three-pronged. First, appellants point out that since the jury rejected Cornell's assault claim, it necessarily rejected his claim of excessive force. Relying on the requirement that a Section 52.1 claim must rest on evidence of "threat[], intimidation or coercion," they contend it was error for the trial court to submit this statutory claim to the jury. We reject the premise of this argument. Nothing in the Phase I Special Verdict Form required the jury to make any express finding on the issue of unreasonable force. The Phase I jury instruction on assault defined unreasonable force using the Fourth Amendment multifactor articulation of excessive force in *Graham v. Connor* (1989) 490 U.S. 386 (*Graham*), and listed the use of unreasonable force, so defined, as one of six elements of assault.[23] Because the use of unreasonable force was only one element of the

_____

person for the purpose of interfering with the right of such other person to vote or to vote as he may choose . . ."].)

By contrast, the text of Section 1983 and its criminal counterpart Section 242—statutes which are limited to state action, and focus on "depriv[ation]'" of rights instead of interference with rights—bears almost no similarity to Section 52.1, other than common use of the phrase "under color of law." Section 1985(3), the civil counterpart to Section 241, also differs significantly from Section 241. Section 1985(3) is limited to private acts of "conspir[ing] or go[ing] in disguise on the highway or on the premises of another, for the purpose of depriving . . . any person or class of persons of the equal protection of the laws . . . ." Based on its limiting language, a requisite element of any Section 1985(3) claim is that it must be based on "some racial [or] . . . otherwise class-based, invidiously discriminatory animus behind the conspirators' action" (*Griffin v. Breckenridge* (1971) 403 U.S. 88, 102), which is the very limitation our Supreme Court held in *Venegas* does not apply to Section 52.1. (*Venegas*, *supra*, 32 Cal.4th at p. 843.) This compare-and-contrast exercise thus leaves Section 241 as the most closely comparable statute to Section 52.1 among its historical antecedents in federal civil rights law.

[23] The court's assault instruction, adapted from Judicial Council Of California Civil Jury Instructions (CACI) Nos. 1301 (Assault—Essential Elements) and 1305

assault instruction, the jury may have rejected the assault claim while still believing there was unreasonable force here.

Cornell's theory was that Officer Brandt and Sergeant Gin committed an assault by pointing a gun at him, putting him in fear of being shot. In support of this theory, he presented evidence that the gun-pointing by both officers in a low-threat level situation violated the San Francisco Police Department's policy on the use of deadly force and officer training standards for handling weapons. Indulging all inferences in favor of reconciling the Phase I and Phase II verdicts, as we must, a rational jury in Phase II could have concluded that, under the circumstances, the threatened use of deadly force was unreasonable (see *Robinson v. Solano County* (9th Cir. 2002) 278 F.3d 1007, 1013 [officers' conduct in pointing gun at detainee at close range presents triable issue of fact on excessive force claim]), while at the same time concluding in Phase I that the gun-pointing—standing alone—was not a substantial factor in the "harm" caused to Cornell. On this reading of the jury's verdicts, what accounts for the Phase II findings against Officer Brandt and Sergeant Gin on the Section 52.1 claim is that the gun-pointing *combined with* the unlawful arrest, the baseless Penal Code section 148 citation, and all of the other mistreatment of Cornell following the arrest, caused the harm.

The explanation for the finding against Cornell on the assault claim, but in his favor on the Section 52.1 claim, may also be one of timing. In resolving the assault claim, the jury may have decided in Phase I that Officer Brandt and Sergeant Gin were privileged to use force under Penal Code section 835a ["[a]ny peace officer who has reasonable cause to believe . . . [an arrestee] has committed a public offense may use reasonable force to effect the arrest]", but then, following the court's determination of no

---

(Battery by Police Officer), advised the jury that, to prove assault, Cornell must establish that (1) a defendant threatened to touch him in a harmful or offensive manner, (2) it reasonably appeared to him the threat was about to be carried out, (3) the threat constituted unreasonable force, (4) he did not consent to the touching, (5) he was harmed, and (6) the threatening conduct was a substantial factor in causing his harm.

30

probable cause, concluded in Phase II that there was no such privilege.[24]  For both of these reasons, we do not accept the premise that the jury's adverse assault verdict in Phase I destroyed the basis for Section 52.1 liability in Phase II.  (See *Bender v. County of Los Angeles* (2013) 217 Cal.App.4th 968, 978 (*Bender*) [where an arrest is unlawful *and* excessive force is used in effectuating it, there is coercion within the meaning of Section 52.1].)

Second, appellants argue that Cornell proved a false arrest, at most, and that liability under Section 52.1 cannot be based on false arrest alone.  (See *Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 67, 69 (*Allen*) [rejecting claim that an arrest without probable cause constitutes "coercion" within the meaning of Section 52.1].)  We have more here than a simple false arrest.  Cornell's arrest was carried out with threats of violence and was just the start of a series of events suggesting an intent to demean him and set him up for termination, without regard to whether the suspicions that led to the arrest were well-founded.  After an interrogation by Officer Brandt at Park Station during which Brandt accused Cornell of lying, over his protestations he had done nothing wrong, Cornell was finally released, nearly six hours following his arrest.  By that time, a team of officers had undertaken a fruitless hunt for incriminating evidence in Golden Gate Park; a secret recording device was placed next to Cornell in an ambulance "because [he] might say something stupid," which yielded nothing; and a hospital drug test turned up negative.

Then, upon Cornell's release, he was cited for the misdemeanor offense of violating Penal Code section 148, subdivision (a).  That citation was referred to the

---

[24] The trial court gave a Phase I instruction under Penal Code section 835a in connection with the assault claim, but did not re-instruct on Penal Code section 835a in Phase II.  Appellants contend the omission of a Penal Code section 835a instruction in Phase II was error, but they made no specific request for such an instruction in Phase II, and as a result, they have waived the issue.  Even had they made one, however, they would not have been entitled to another Penal Code section 835a instruction, since, as noted, by that point—given the trial court's no probable cause determination at the conclusion of Phase I—the requirement in Penal Code section 835a that Officer Brandt and Sergeant Gin acted with "reasonable cause to believe the person to be arrested has committed a public offense" was lacking.

31

internal affairs unit of the San Francisco Police Department, and without further investigation by internal affairs, the citation became the basis of a misconduct charge, resulting in Cornell's firing. Officer Brandt, who gave Cornell the citation, admitted not knowing the factual basis for the Penal Code section 148 charge, and Sergeant Gin, who approved the citation, admitted he had no independent knowledge about why it was issued. According to Alice Villagomez, the head of Human Resources in the San Francisco Police Department, any experienced officer would have understood the citation would likely result in Cornell's termination. All of this evidence supports an inference not only that Officer Brandt and Sergeant Gin arrested Cornell unlawfully, but that they acted spitefully toward him as well since they knew or should have known the career-ending Penal Code section 148 citation they gave him upon his release was baseless.[25]

Third, appellants invoke *Shoyoye v. County of Los Angeles* (2012) 203 Cal.App.4th 947 (*Shoyoye*), on which *Bender* and *Allen* both rely. We are told that *Shoyoye* "requires a showing of coercion independent from the coercion inherent in the wrongful detention itself" (*Shoyoye*, at p. 959), and that, because none of the mistreatment of Cornell is meaningfully segregable or discrete from his arrest, appellants still must prevail as a matter of law on the Section 52.1 claim. We think appellants read too much into *Shoyoye*. There, the plaintiff was arrested on outstanding bench warrants for two minor offenses, one based on a theft by someone posing as him, and upon a subsequent court appearance he was ordered released. (*Id*. at pp. 950–951.) Due to a computer error, however, he remained in Los Angeles County jail on a parole violation hold order meant for someone else. (*Id*. at pp. 951–953.) Kafkaesque is an overused

---

[25] Cf. *Gillan, supra,* 147 Cal.App.4th at pages 1047, 1052–1053 (affirming jury finding of liability against police defendants on Section 52.1 claim by high school girls' basketball coach who was arrested without cause on an unfounded molestation charge that district attorney declined to prosecute for lack of evidence, while reversing damages award because the trial court erroneously submitted to the jury defamation and intentional infliction of emotional distress claims for which defendants had official immunity, allowing the jury to award nearly $4.5 million in damages in lump sum on all claims).

term, but it fairly describes plaintiff Shoyoye's 16-day incarceration.[26]  After the mistake was finally discovered and he was released, plaintiff Shoyoye sued the county for keeping him in custody despite the release order, alleging a false imprisonment claim for his wrongful incarceration as well as a Section 52.1 claim on the theory that the county's failure to discover the mistaken hold order violated his right under the Fourth Amendment and under article 1, section 13 of the California Constitution "to be free from . . . unreasonable seizure by actual or implied use of threats, intimidation or coercion." (*Id*. at p. 953.)[27]

---

[26] *Shoyoye*, *supra,* 203 Cal.App.4th at pages 951–952 ("Shoyoye asked a total of six to eight people for assistance during his incarceration. . . . [I]nmates were periodically permitted to submit one written question on a 'yellow sheet' form.  Shoyoye submitted such a form asking, 'Why am I here?'  He received the response that he was subject to a 'DCL hold.'  He submitted another form inquiring what a 'DCL hold' was, along with one other question, and received the response that he was only entitled to ask one question and he had asked two.  He submitted other yellow sheets indicating he believed he should not be there, but he received no helpful responses.  [¶]  Shoyoye told custody assistant Lawrence Wong that he thought he should be released.  Wong acknowledged that if what he said was true, then there was a problem.  Wong told him to talk to Deputy Niels Gittisarn.  Shoyoye asked him for assistance, and Gittisarn told him, 'Get back to me.'  However, when Shoyoye attempted to speak to him the next day, Gittisarn rebuffed him, yelling that he was busy.").

[27] No doubt because the issue was never raised, *Shoyoye* is silent on a key threshold question:  Did plaintiff Shoyoye assert a legally viable right "secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state"?  It is not evident to us that he did.  Because the reasonableness of a seizure for Fourth Amendment purposes is judged at the time of an arrest or detention, once Shoyoye conceded there was probable cause for his arrest he appears to have conceded away at the same time any legal basis for a claim of unreasonable seizure beyond that point.  (See *Rivera v. County of Los Angeles* (9th Cir. 2014) 745 F.3d 384, 389–390 ["post-arrest incarceration is analyzed under the Fourteenth Amendment"]; *Lee v. City of Los Angeles* (9th Cir. 2001) 250 F.3d 668, 683–685 [separately analyzing arrest under Fourth Amendment and post-arrest incarceration under Fourteenth Amendment].)  While a post-arrest claim of Fourth Amendment violation may be available where the plaintiff seeks to challenge a subsequent pretrial detention by attacking the existence of probable cause ab initio (see *Manuel v. Joliet* (2017) 580 U.S.__ [137 S.Ct. 911, 915, 919] [Section 1983 claim asserted by prisoner held for 48 days in pretrial detention pursuant to judicial determination of probable cause based on a false statements from the

Reversing a plaintiff's jury verdict for Shoyoye on the Bane Act claim while affirming on the false imprisonment claim, the appellate panel in *Shoyoye* set forth its analysis of Section 52.1 liability in two steps, first concluding that, "[t]he statutory framework of section 52.1 indicates that the Legislature meant the statute to address interference with constitutional rights involving more egregious conduct than mere negligence." (*Shoyoye*, *supra*, 203 Cal.App.4th at p. 958; see *id.* at p. 959 ["The apparent purpose of the statute is not to provide relief for an overdetention brought about by human error rather than intentional conduct"].) Although that would have been enough to resolve the Section 52.1 claim had it been asserted on a standalone basis without an accompanying tort claim, the court went on in a separate section to explain that violation of Section 52.1 requires a showing of coercion "independent from the coercion inherent in the wrongful detention itself." (*Shoyoye,* at pp. 959, 960–961.) While acknowledging that plaintiff Shoyoye's imprisonment may have been "traumatic" and "frightening," and that "County employees certainly were rude to him at times," the court concluded that "they did not threaten or intimidate [him] for voicing his opinion that he should be released. They coerced him to remain incarcerated, but they did not for example coerce him to stop inquiring about his release, threaten him for doing so, or punish him in any way. No one ignored plaintiff deliberately, knowing that he should in fact be released, let alone purposefully threaten or intimidate him. At worst they were rude and indifferent to his inquiries. But jail officials do not have a duty to be polite." (*Id.* at p. 961.) We see the case before us differently, for reasons we explain below.

3.      *Shoyoye is a Jail Overdetention Case that Began with A Lawful Arrest*

To begin with, the record here supports a finding of more than negligence or lack of courtesy. More importantly, we view the second step of the court's Section 52.1 analysis in *Shoyoye*—its independent from inherent coercion test—as inapplicable where, as here, a Bane Act plaintiff pleads and proves a constitutionally unlawful arrest. We

arresting officer is properly analyzed under the Fourth Amendment]), Shoyoye made no such claim.

34

reach this conclusion upon a close reading of *Shoyoye*, paying careful attention to its facts and to the claims at issue there. The situation leading to plaintiff Shoyoye's mistaken incarceration started with his arrest, and originally he alleged a constitutionally unreasonable seizure, but as the case proceeded there was never any dispute that the arrest was lawful. In fact, he conceded there was probable cause to arrest him. (*Shoyoye, supra,* 203 Cal.App.4th at p. 951, fn. 2.) Thus, the nub of his Section 52.1 theory was not unlawful arrest, but rather his continued incarceration despite a judicial release order—in short, jail overdetention.

At trial, Shoyoye presented evidence that, while in jail, he inquired repeatedly about why he had not been released, but was ignored by his jailers until, through a friend, he managed to have a member of the Legislature look into his circumstances, which ultimately triggered his release. (*Shoyoye, supra,* 203 Cal.App.4th at pp. 951–953.) On that record, the appellate court affirmed the false imprisonment verdict (*id.* at p. 963), consistent with well-established California law that a jailer who "knew or should have known of the illegality of the imprisonment" will be liable *in tort* for false imprisonment. (*Sullivan v. County of Los Angeles* (1974) 12 Cal.3d 710, 717–718 (*Sullivan*).)[28] While the act of keeping Shoyoye in jail despite his pointed inquiries was sufficient to support

---

[28] The test for false imprisonment in jail overdetention cases established in *Sullivan* "requires either that the sheriff have actual knowledge that the imprisonment of the plaintiff is unlawful or alternatively that he have some notice sufficient to put him, as a reasonable man, under a duty to investigate the validity of the incarceration." (*Sullivan, supra,* 12 Cal.3d at p. 719.) *Shoyoye*'s brief discussion of false imprisonment recites its requisite elements (" '(1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief" (*Shoyoye, supra,* 203 Cal.App.4th at p. 958, quoting *Easton v. Sutter Coast Hospital* (2000) 80 Cal.App.4th 485, 496)), and then concludes without elaboration that "[t]he evidence presented at trial was clearly sufficient to establish those elements." (*Shoyoye,* at p. 958.) The court never mentions *Sullivan* and appears to assume there is something it calls "a tort claim for negligent false imprisonment" (*ibid.*)—the *Sullivan* test is actually more akin to one requiring at least gross negligence—but the result it reaches, affirming the false imprisonment verdict on facts showing that plaintiff Shoyoye repeatedly brought his mistaken incarceration to the attention of multiple jail employees, tracks *Sullivan*'s reasoning.

tort liability, the court saw his jailers' negligent failure to discover they were holding the wrong man—a mistake attributable, at bottom, to computer error—as insufficient to support Section 52.1 liability. The difference in the court's treatment of these two claims is key, for any consideration of the breadth of *Shoyoye*'s Bane Act holding must begin with the recognition that maintaining a meaningful distinction between tort and statutory liability was fundamental to its reading of Section 52.1.

When the court announces that Section 52.1 requires "coercion independent from the coercion inherent in the wrongful detention itself" (*Shoyoye, supra,* 203 Cal.App.4th at p. 959), its focus is on whether the requisite level of scienter for Section 52.1 liability had been met in a setting where the plaintiff proved negligence, at most. To support Section 52.1 liability in that context, the court observes, there must be "an additional showing of *ill will or blameworthy* conduct." (*Id.* at p. 958, italics added.) It found no evidence that while in jail "any conduct directed at [Shoyoye] was *for the purpose* of interfering with his constitutional rights." (*Id.* at p. 961, italics added.) "[Jail] employees could reasonably rely on the information in the computer system, based on the reasonable assumption that the quality control check would catch errors." (*Ibid*.) All of Shoyoye's treatment while in jail, the court concludes, was "reasonable and incident to maintaining a jail," and even if his jailers did something to him that might be characterized as "intimidation" or "coercion," none of it was "carried out in order to effect a *knowing* interference with [his] constitutional rights." (*Ibid*., italics added.)

*Shoyoye* uses a variety of terms to describe the scienter it has in mind (see 203 Cal.App.4th at p. 958 ["intentional and callous"]; *id*. at p. 959 ["deliberate or spiteful"]; *id*. at p. 961 ["knowing and blameworthy"]), but its analysis sheds little light on how the required level of scienter should be evaluated in unlawful arrest cases. *Bender* suggests an answer, holding that, on the facts presented there—the plaintiff was arrested without probable cause, handcuffed, and then gratuitously beaten and pepper-sprayed while offering no resistance—constitutionally excessive force met the required standard. But in the end *Bender* is just as opaque as *Shoyoye*. Ultimately, the court couches its holding in the same analytical framework as *Shoyoye* (*Bender,* at p. 981 ["[w]here, as here, an arrest is unlawful *and* excessive force is applied in making the arrest, there has been coercion

36

'independent from the coercion inherent in the wrongful detention itself,' "] original italics), thus implicitly accepting the applicability of *Shoyoye*'s "independ[ence] from inherent coercion" test in unlawful arrest cases.

We agree that the use of excessive force can be enough to satisfy the "threat, intimidation or coercion" element of Section 52.1, but we do not accept the premise that *Shoyoye* applies in unlawful arrest cases. Because, read closely, *Shoyoye*'s discussion of coercion "independent from the coercion inherent in the wrongful detention itself" was aimed at separating tort liability from statutory liability in the specific context of a jail overdetention following a lawful arrest—on a record where no legally viable claim of any constitutional violation was pleaded or proved—we view its "independ[ence] from inherent coercion" test as simply inapplicable. The case before us is not a jail overdetention case. A constitutionally unlawful arrest was proved, and, as noted above, we have more than a simple false arrest. Under these circumstances, the better approach, in our view, is to focus directly on the level of scienter required to support a Section 52.1 claim, without the trappings of *Shoyoye*'s frame of analysis.

4.  *Where an Unlawful Arrest is Properly Pleaded and Proved, the "Threat, Intimidation or Coercion" Element of Section 52.1 Requires a Specific Intent to Violate Protected Rights*

We acknowledge that some courts have read *Shoyoye* as having announced "independen[ce] from inherent coercion" as a requisite element of all Section 52.1 claims alleging search-and-seizure violations, but we think those courts misread the statute as well as the import of *Venegas*.[29] By its plain terms, Section 52.1 proscribes any

---

[29] (See, e.g., *Lyall v. City of Los Angeles* (9th Cir. 2015) 807 F.3d 1178, 1196 ["[n]umerous California decisions make clear that a plaintiff in a search-and-seizure case must allege threats or coercion beyond the coercion inherent in a detention or search in order to recover under the Bane Act"], citing *Allen*, *supra*, 234 Cal.App.4th at p. 69 [unlawful arrest]; *Quezada v. City of Los Angeles* (2014) 222 Cal.App.4th 993, 1007–1008 [unlawful search]; *Shoyoye*, *supra,* 203 Cal.App.4th at p. 959.) It strikes us as an overstatement to say there are "numerous California decisions" for this proposition or that our case law is "clear" on the point. *Allen*, a pleading case, and the sole published California appellate opinion to consider *Shoyoye* in any depth, ultimately holds only that "conclusory allegations of 'forcible' and 'coercive' interference with plaintiffs'

37

"interference with" or attempted "interference with" protected rights carried out "by threat, intimidation or coercion." Nothing in the text of the statute requires that the offending "threat, intimidation or coercion" be "independent" from the constitutional violation alleged. Indeed, if the words of the statute are given their plain meaning, the required "threat, intimidation or coercion" can never be "independent" from the underlying violation or attempted violation of rights, because this element of fear-inducing conduct is simply the means of accomplishing the offending deed (the "interference" or "attempted interference"). That is clear from the structure of the statute, which reads, "If a person or persons, whether or not acting under color of law, interferes *by* threat, intimidation, or coercion," a private action for redress is available. (§ 52.1, subd. (a), italics added.)

In *Venegas*—which rejected a construction of Section 52.1 limiting its applicability to "threat[s], intimidation or coercion" against minorities and other statutorily protected groups—the Supreme Court declined to place "added restrictions on the scope of section 52.1" beyond its plain language, concluding that that "would appear to be more a legislative concern than a judicial one." (*Venegas, supra*, 32 Cal.4th at p. 843.) The same may be said here. Properly read, the statutory phrase "threat, intimidation or coercion" serves as an aggravator justifying the conclusion that the underlying violation of rights is sufficiently egregious to warrant enhanced statutory remedies, beyond tort relief. We see no reason that, *in addition*, the required "threat, intimidation or coercion," whatever form it may take, must also be transactionally "independent" from a properly pleaded—and proved—unlawful arrest.

The phrase "under color of law" indicates, without doubt, that the Legislature intended to include law enforcement officers within the scope of Section 52.1 if the requisites of the statute are otherwise met. (See *ante*, fn. 17.) Much of what law

---

constitutional rights are inadequate to state a cause of action for a violation of section 52.1." (*Allen*, at p. 69.) *Quezada* refers briefly to *Shoyoye*'s independent from inherent coercion test in a background summary of Section 52.1 law, but never applies it, relying instead on the fact that no coercion at all was present in the case. (*Quezada*, at p. 1008).

38

enforcement officers do in settings that test the limits of their authority is "inherently coercive." Given that reality, it seems to us inconsistent with an intent to bring law enforcement within the scope of the statute—which is what the phrase "under color of law" does—to say, categorically, even where an unlawful arrest is properly pleaded and proved, that "where[ever] coercion is inherent in the constitutional violation alleged, . . . the statutory requirement of 'threats, intimidation, or coercion' is not met." (*Shoyoye*, *supra*, 203 Cal.App.4th at p. 959.) When applied to both lawful and unlawful conduct, such a reading of Section 52.1, in effect, creates a judicially-fashioned immunity; and not merely a qualified immunity, but an absolute one covering a broad category of activity so long as it may be described as "inherently coercive."

In federal court, where Section 52.1 claims are frequently brought along with Section 1983 claims under federal pendent jurisdiction, "[t]he Bane Act's requirement that interference with rights must be accomplished by threats[,] intimidation or coercion 'has been the source of much debate and confusion.' " (*McKibben v. McMahon* (C.D. Cal. Apr. 17, 2015, No. EDCV 14-02171 JGB (SPx)) 2015 U.S. Dist. LEXIS 176696, at p. *7 (*McKibben*); see also *K.T. v. Pittsburg Unified School Dist.* (N.D. Cal. 2016) 219 F.Supp.3d 970, 982 ["[c]ourts deciding whether the 'threat, intimidation or coercion' [element of Section 52.1] must be distinct from the alleged underlying constitutional or statutory violation have come out all over the map"].) We have endeavored to provide some clarity.

In doing so, we are not obliged to follow the construction the Supreme Judicial Court of Massachusetts placed on the MCRA in what appears to be some brief, fugitive dicta at the end of the opinion in *Longval v. Commissioner of Correction* (1989) 404 Mass. 325 [535 N.E.2d 588] (*Longval*), which *Shoyoye* relied upon (*Shoyoye, supra,* 203 Cal.App.4th at p. 960 [discussing *Longval*]) and which appears to be the original source of the confusion. (See *Jones*, *supra*, 17 Cal.4th at p. 337 ["the rule of deference to another state's interpretation of a statute that provided a model for a California statute 'establishes . . . only a presumption of legislative intent . . . [and] even when the presumption properly operates it does not compel the adoption of the judicial construction of the other jurisdiction's statute' "].) *Longval*, a qualified immunity case,

gave no consideration to the text or structure of the MCRA, much less its origin in federal civil rights law.[30]

Accordingly, we hold that, where, as here, an unlawful arrest is properly pleaded and proved, the egregiousness required by Section 52.1 is tested by whether the circumstances indicate the arresting officer had a specific intent to violate the arrestee's right to freedom from unreasonable seizure, not by whether the evidence shows something beyond the coercion "inherent" in the wrongful detention. (See *In re M.S.*, *supra*, 10 Cal.4th at p. 713 [adopting for purposes of Pen. Code, § 422.6 the specific intent standard first enunciated in Justice Douglas's plurality opinion in *Screws v. United States* (1945) 325 U.S. 91 (*Screws*)]; see also *People v. Lashley* (1991) 1 Cal.App.4th 938, 948–949 (*Lashley*).) The *Screws* specific intent standard has been an established feature of federal civil rights law under Section 241 since the mid-1960s (*United States v. Price* (1966) 383 U.S. 787, 792, fn. 5; *United States v. Guest* (1966) 383 U.S. 745, 753–754)[31] and, as acknowledged by appellants' counsel at oral argument, it accomplishes in substance the same thing as the independent from inherent coercion test since it ensures ordinary negligence is not cognizable under Section 52.1.

We recognize, obviously, that Section 52.1 is civil, while Section 241 is criminal, but in adopting the *Screws* standard we find it particularly significant that so much of the

---

[30] The uncertainty engendered by *Shoyoye* here in California appears to be mirrored among courts applying *Longval* in Massachusetts. (Compare *Nuon v. City of Lowell* (D. Mass. 2011) 768 F.Supp.2d 323, 335, fn. 8, citing *Bally v. Northeastern Univ.* (1989) 403 Mass. 713, 718 [532 N.E.2d 49, 52] [arrest without probable cause is covered by MCRA]; *Batchelder*, *supra*, 473 N.E.2d at p. 1131 and *Santiago v. Fenton* (1st Cir. 1989) 891 F.2d 373, 383, with *Ciolino v. Eastman* (D. Mass. 2015) 128 F.Supp.3d 366, 380, citing only federal cases, *Santiago v. Keyes* (D. Mass. 2012) 890 F.Supp.2d 149, 156; *Titus v. Town of Nantucket* (D. Mass. 2011) 840 F.Supp.2d 404, 416; *Goddard v. Kelley* (D. Mass. 2009) 629 F.Supp.2d 115, 129 ["[t]he majority of courts have held that in cases involving wrongful arrests . . . , the fact of a Fourth Amendment violation, standing alone, does not give rise to a claim under the MCRA"].)

[31] See Hon. Paul J. Watford, *Screws v. United States and the Birth of Federal Civil Rights Enforcement* (2014) 98 Marq. L.Rev. 465, 481–484.

text and structure of Section 52.1 appears to descend from Section 241. It seems to us that, when our Legislature enacted hate crime legislation in 1987, it chose not to adhere strictly to the federal scheme by adopting a civil enforcement statute on the model of Section 1983, covering "deprivations" of rights and limiting the statute to public officials or other conduct evincing state action. Instead, it used as a model Section 241—a criminal conspiracy statute—giving the statute enough breadth to reach a wide range of "interference" with "secured rights" by means of fear-inducing conduct, whether undertaken by private actors or public officials. In essence, the Legislature created a hybrid of the historic federal civil rights enforcement scheme, using Section 241 as a unitary model for criminal as well as civil enforcement. The burden of proof is fundamentally different in these two arenas, of course, but other than that we see no reason why the applicable mens rea element ought to differ.[32]

---

[32] Our reading of Section 52.1 is consistent with the view taken by "the majority of federal district courts in California[, which] have held [in Bane Act cases] that '[w]here Fourth Amendment unreasonable seizure or excessive force claims are raised and intentional conduct is at issue, there is no need for a plaintiff to allege a showing of coercion independent from the coercion inherent in the seizure or use of force.' " (*Simmons*, *supra*, 7 Cal.App.5th at p. 1126, quoting *Dillman v. Tuolumne County* (E.D. Cal., May 7, 2013, No. 1:13–CV–00404–LJO–SKO) 2013 U.S. Dist. LEXIS 65206, at p. *58; *Morse v. County of Merced* (E.D. Cal., June 13, 2016, No. 1:16–CV–00142–DAD–SKO) 2016 U.S. Dist. LEXIS 76731, at p. *38 [this rule is "the weight of authority among District Courts in California"]; *Mann v. County of San Diego* (S.D. Cal. 2015) 147 F.Supp.3d 1066, 1092 ["the majority of courts follow this rule"].) These courts have held various kinds of low- to mid-level force may meet the coercion element of Section 52.1. (See, e.g., *Lawrence v. City & County of San Francisco* (N.D. Cal. June 15, 2017, No. 14-cv-00820-MEJ) 2017 U.S. Dist. LEXIS 92499, at pp. *40-41 [tight handcuffing, including handcuffing to a bench]; *Johnson v. Shasta County* (E.D. Cal. 2015) 83 F.Supp.3d 918, 934 [yanking arrestee up from the ground by handcuffs, pointing gun and threatening to shoot]; *Dillman*, *supra*, 2013 U.S. Dist. LEXIS 65206, at p. *22 [tight handcuffing during transport of arrestee]; *Stewart v. Saukkola* (E.D. Cal. June 22, 2016, No. 2:16-cv-00388-KJM-EFB) 2016 U.S. Dist. LEXIS 81520, at p. *9 [sitting on top of prone detainee and kneeing him in back]; *Haynes v. City and County of San Francisco* (N.D. Cal. Jul 28, 2010, No. C 09-0174 PJH) 2010 U.S. Dist. LEXIS 76829, at p. *18 [pushing arrestee into a wall].) And in some circumstances, depending on the right alleged to have been interfered with, physical force is not required at all. (*McKibben*, *supra,* 2015 U.S. Dist. LEXIS 176696, at p. *8 ["coercive choice" forced upon gay,

5. *Application of the Specific Intent Standard*

The application of the *Screws* specific intent standard here is straightforward. As explained in *Lashley*, *supra*, 1 Cal.App.4th 938, which was cited with approval by our Supreme Court in *In re M.S.*, *supra*, 10 Cal.4th at p. 713, this test " 'essentially sets forth two requirements for a finding of "specific intent" . . . . The first is a purely legal determination. Is the . . . right at issue clearly delineated and plainly applicable under the circumstances of the case?[33] If the trial judge concludes that it is, then the jury must make the second, factual, determination. Did the defendant commit the act in question with the particular purpose of depriving the citizen victim of his enjoyment of the interests protected by that . . . right? If both requirements are met, even if the defendant did not in fact recognize the [unlawfulness] of his act, he will be adjudged as a matter of law to have acted [with the requisite specific intent]—*i.e.,* "in reckless disregard of constitutional [or statutory] prohibitions or guarantees." ' " (*Lashley,* at pp. 948–949.)

Applying the first step of this test here, the "right at issue" is Cornell's federal and state constitutional right to be free from arrest without probable cause. Legally, there is nothing vague or novel about that claim under the circumstances of this case. Viewing the Phase I evidence in the light most favorable to Cornell, the protected right he asserts was "clearly delineated and plainly applicable." Thus, we reject appellants' contention

---

bisexual or transgender inmates to accept segregated housing with fewer privileges than other inmates]; *M.H. v. County of Alameda* (N.D. Cal. 2013) 90 F.Supp.3d 889, 898 [deliberate indifference to prisoner's medical needs].) These cases stand in stark contrast to others that apply the independent from inherent coercion test—in our view incorrectly—outside the confines of jail overdetention, taking that test to the limit of its logic. (See, e.g., *Bordegaray v. County of Santa Barbara* (C.D. Cal. 2016) 2016 U.S. Dist. Lexis 172269, at pp.*39–41 [evidence of constitutionally excessive force in police shooting case held insufficient to support Section 52.1 claim because, other than being shot, the plaintiff failed to show any "threat, intimidation or coercion"].)

[33] By way of illustration, we observe that the Section 52.1 claim in *Shoyoye* likely would have not have met this first step of the specific intent standard because the plaintiff in that case appears to have alleged no viable theory of constitutional violation. (See fn. 27, *ante*.) The same is true of a recent case applying *Shoyoye*, *Julian v. Mission Community Hospital* (2017) 11 Cal.App.5th 360, 395 ("other than the actions necessary to detain [plaintiff], which the police had probable cause to take, [plaintiff] alleged without explanation that the police defendants 'engaged in tactics to scare' her").

42

that, as a matter of law, the Section 52.1 claim never should have been submitted to the jury. The second requirement, a question of fact, is whether appellants acted with the "particular purpose" of depriving Cornell of his right to be free from arrest without probable cause. Subjective "spite" was relevant here, along with all of the objective circumstances surrounding the unlawful arrest, both before it and after it. But whether the appellant officers understood they were acting unlawfully was not a requirement. Reckless disregard of the "right at issue" is all that was necessary.

In Phase II, the jury was instructed that "Plaintiff Cornell claims . . . Defendants Brandt and Gin intentionally interfered with or attempted to interfere with his civil rights by threats, intimidation, or coercion." According to the jury instructions, to return a verdict for Cornell on the Section 52.1 claim, the jury was required to find that he proved "all of the following: [¶] 1. That the Defendant made threats of violence against Plaintiff causing Plaintiff to reasonably believe that if he exercised his right to be free from unlawful detention or unlawful arrest, Defendant would commit violence against him and that Defendant had the apparent ability to carry out the threats; [¶] 2. That Plaintiff was harmed; and [¶] 3. That the Defendant's conduct was a substantial factor in causing Plaintiff's harm." (CACI No. 3066.) These instructions properly focused the jury on intentional violation of Cornell's right to be free from unreasonable seizure.

Although Cornell's primary theory at trial was that the gun-pointing made his false arrest particularly egregious (hence the focus on "threats of violence" in the instructions), it must be borne in mind that he also submitted proof that the harm he suffered from the arrest—his job loss, in particular—was inflicted out of spite. Considering the evidence surrounding Cornell's arrest in its full context, it seems to us a rational jury could have concluded not only that Officer Brandt and Sergeant Gin were unconcerned from the outset with whether there was legal cause to detain or arrest him, but that when they realized their error, they doubled-down on it, knowing they were inflicting grievous injury on their prisoner. On this reading of the evidence, these two officers had every opportunity to exercise restraint as it became clearer and clearer that their initial suspicions of Cornell were unfounded, but rather than let the matter go when they finally released him, they retaliated against him as a way of undermining his ability to claim to

43

superiors he was arrested without probable cause. This apparent effort to obstruct Cornell's ability to assert his right to freedom from unreasonable seizure violated Section 52.1 just as surely as his actual arrest did, while compounding the harm. On this record, we have no trouble concluding the specific intent standard was met.[34]

## III.    DISPOSITION

The judgment and the award of attorney's fees and costs are affirmed. Respondent shall recover costs on appeal.

---

[34] Appellants present no separate argument in support of their appeal of the award of statutory attorney's fees and costs, apart from the contention that the Section 52.1 verdict should be reversed. Having concluded there is no infirmity in the Section 52.1 verdict, we will sustain the accompanying award of fees and costs. Appellants also suggest in their reply brief that they seek to appeal from the judgment on the negligence and interference with economic advantage claims, but there, too, they present no separate argument and thus they have waived any defect in the judgment insofar as it rests on liability for those claims.

_____
Streeter, J.

We concur:


_____
Ruvolo, P.J.


_____
Rivera, J.

A141016, A142147/*Cornell v. City & County of San Francisco*

Trial Court:   City & County of San Francisco Superior Court

Trial Judge:   Hon. Lynn O'Malley Taylor

Counsel:

Haddad & Sherwin, Michael J. Haddad, Julia Sherwin, Genevieve K. Guertin, and T. Kennedy Helm for Plaintiff and Respondent.

Dennis J. Herrera, City Attorney, Cheryl Adams, Chief Trial Deputy, Margaret W. Baumgartner, Deputy City Attorney  for Defendants and Appellants.