Filed 4/28/20

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION ONE

|  |  |
|---|---|
| COUNTY INMATE TELEPHONE SERVICE CASES. | B291341<br><br>JCCP No. 4897<br><br>(Los Angeles County Super. Ct. case No. BC635599) |

APPEAL from a judgment of the Superior Court for the County of Los Angeles.  Carolyn B. Kuhl, Judge.  Affirmed.

Kaye, McLane, Bednarski & Litt, Barrett S. Litt, Ronald O. Kaye; Rapkin & Associates, Michael S. Rapkin and Scott B. Rapkin for Plaintiffs and Appellants.

Jonathan M. Coupal, Timothy A. Bittle and Laura E. Dougherty for Howard Jarvis Taxpayers Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

Schonbrun Seplow Harris & Hoffman and Catherine Sweetser for Human Rights Defense Center, Public Counsel, American Civil Liberties Union of Southern California, Worth Rises, Prison Law Office, and Impact Fund as Amici Curiae on behalf of Plaintiffs and Appellants.

Lewis Brisbois Bisgaard & Smith, Raul L. Martinez and Ryan D. Harvey for Defendants and Respondents Counties of Los Angeles, Orange, San Bernardino, Ventura, Alameda and Santa Clara.

James R. Williams, County Counsel (Santa Clara), and Michael Leon Guerrero, Deputy County Counsel, for Defendant and Respondent County of Santa Clara.

Arias & Lockwood, Christopher D. Lockwood; Lewis Brisbois Bisgaard & Smith, John M. Porter and Arthur K. Cunningham for Defendant and Respondent County of Riverside.

Sharon L. Anderson, County Counsel (Contra Costa) and D. Cameron Baker, Deputy County Counsel, for Defendant and Respondent County of Contra Costa.

Wagstaffe, Von Loewenfeldt, Busch & Radwick, Michael Von Loewenfeldt, Frank Busch; John C. Beiers, County Counsel (San Mateo) and David Silberman, Chief Deputy County Counsel, for Defendant and Respondent County of San Mateo.

Thomas E. Montgomery, County Counsel (San Diego), Joshua Heinlein and Jeffrey P. Michalowski, Senior Deputy County Counsel, for California State Association of Counties and League of California Cities as Amici Curiae on behalf of Defendants and Respondents.

———————————————————

**SUMMARY**

In this coordinated proceeding, inmates in county jails in nine California counties challenge the exorbitant commissions paid by telecommunications companies to the nine counties under contracts giving the telecommunications companies the exclusive right to provide telephone service for the inmates. The

2

telecommunications companies pass on the cost of the commissions to the inmates and their families in the fees charged to use the inmate calling system, the only telephone system available to them. The phone rates would be significantly lower if they did not include charges to recoup the commissions paid to the counties. The rates are not related to the cost of the services provided.

The inmates say these fees are unlawful taxes under Proposition 26, which requires voter approval of "any levy, charge or exaction of any kind imposed by a local government" unless limited to the reasonable cost or value. (Cal. Const., art. XIII C, § 1, subd. (e).) None of the commissions in the nine county contracts was approved by the voters. The inmates also allege the commissions violate several statutory provisions.

The trial court sustained a demurrer by the counties without leave to amend, ruling that plaintiffs do not have standing to contend the commissions are an unconstitutional tax, and that the other causes of action fail as well.

We agree with the trial court on all points and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs are inmates in jail facilities in nine counties and their families. The nine counties are defendants. Each defendant county has contracted with a telecommunications company (these companies are not parties), giving the company the exclusive right to establish an inmate calling system in the respective county jails. The inmates must use that system, and relatives who wish to speak with them must establish a prepaid account with the telecommunications company. According to plaintiffs, their families "are charged unreasonable, unjust and

3

exorbitant rates" in order to maintain contact with county inmates.

In exchange for the exclusive right to provide telephone service to inmates, the telecommunications company pays the defendants a guaranteed fee against an identified percentage of the inmate calling system charges. The rates charged to inmates are far greater than those paid for ordinary telephone service. The defendants' share of the revenue collected from inmate calls is referred to as a "site commission," and in all cases is more than 50 percent of the revenue from inmate calls. Under a Los Angeles County agreement with its service provider, for example, the county is guaranteed the greater of $15 million annually or 67.5 percent of the revenues for specified charges described in the contract.

Plaintiffs filed this putative class action lawsuit "to put an end to this unconscionable practice by California counties." Plaintiffs allege the telecommunications companies make a substantial profit even after payment of the commissions; that without the commissions, the charges would be substantially lower; and the commissions are not based on the actual cost or reasonable value of the inmate calling service. Plaintiffs allege the full amount of the charges due to the counties is incurred by the customers of the telecommunications company, and not by the telecommunications company itself.

Plaintiffs acknowledge defendants have complied with Penal Code section 4025, which specifies that the commissions described in plaintiffs' complaint be deposited in an inmate welfare fund. "There shall be deposited in the inmate welfare fund any money, refund, rebate, or commission received from a telephone company or pay telephone provider when the money,

4

refund, rebate, or commission is attributable to the use of pay telephones which are primarily used by inmates while incarcerated."[1]  (Pen. Code, § 4025, subd. (d).)

Plaintiffs allege the commissions are actually an unlawful tax in violation of the California Constitution.  Because none of the commissions was approved by voters, plaintiffs say they are entitled to a refund of the illegal taxes.

Plaintiffs say the jail population is disproportionately composed of African-Americans and Latinos, as well as persons with mental illnesses or substance abuse problems, compared to the overall population of the respective counties.  The telephone charges that provide the source of the commissions received by defendants, and consequently the commissions, have a disparate impact on African-Americans and Latinos, in violation of Government Code section 11135.

Further, plaintiffs allege defendants have violated the Tom Bane Civil Rights Act (Civ. Code, § 52.1, the Bane Act) because

---

[1]     Money deposited in the inmate welfare fund must be expended "primarily for the benefit, education, and welfare of the inmates confined within the jail." (Pen. Code, § 4025, subd. (e).) Any funds "not needed for the welfare of the inmates may be expended for the maintenance of county jail facilities," but "shall not be used to pay required county expenses of confining inmates in a local detention system . . . ." (*Ibid.*) Funds may also be expended to provide indigent inmates with essential clothing and transportation expenses prior to release from county jail. (*Id.*, subd. (i).)

the commissions unlawfully deprive plaintiffs of their rights through intimidation, threat or coercion.[2]

Defendants demurred to the complaint. As noted at the outset, the trial court sustained the demurrer without leave to amend.[3] The court entered judgment on June 6, 2018, and plaintiffs filed a timely notice of appeal.[4]

---

[2] The complaint also alleged the commissions violate plaintiffs' rights of free speech and association, to due process of law, to equal protection of the law, and to just compensation for a public use. Plaintiffs do not pursue these claims on appeal.

[3] The northern California counties filed a supplemental demurrer to the complaint on grounds of res judicata, based on an October 12, 2017 judgment in their favor and against plaintiffs in a lawsuit in the federal district court. Our resolution of the case eliminates any need to consider the parties' arguments on this point.

[4] During briefing, plaintiffs filed a motion for judicial notice of 34 items, including orders by the Federal Communications Commission, provider contracts, government records showing the large size of county jails, and so on. Some documents were presented to the trial court, some were not; many contain information included in the complaint. We conclude they are not necessary or helpful to our resolution of the issues and so deny the motion. We also deny (1) a request by amici curiae California State Association of Counties and League of California Cities for judicial notice of contract materials (said to illustrate that the structure for the contracts between the counties and the telephone providers is commonplace across the state), and (2) plaintiffs' request for judicial notice of a contract sheet, in response to amici (said to demonstrate amici's contracts are not comparable). These materials are not relevant to our disposition of the case.

**DISCUSSION**

A demurrer tests the legal sufficiency of the complaint. We review the complaint de novo to determine whether it alleges facts sufficient to state a cause of action. For purposes of review, we accept as true all material facts alleged in the complaint, but not contentions, deductions or conclusions of fact or law. We also consider matters that may be judicially noticed. When a demurrer is sustained without leave to amend, "we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) Plaintiff has the burden to show a reasonable possibility the complaint can be amended to state a cause of action. (*Ibid.*)

**1.    Proposition 26 and the Standing Issue**

The trial court ruled, and we agree, that plaintiffs do not have standing to contend the commissions are an unconstitutional tax.

All taxes imposed by any local government are subject to voter approval. (Cal. Const., art. XIII C, § 2.) Proposition 26, adopted in 2010, expanded the definition of a tax. A "tax" now includes "any levy, charge, or exaction of any kind imposed by a local government," with seven exceptions.[5] (*Id.,* § 1, subd. (e).)

---

[5]    As relevant to plaintiffs' complaint, these exceptions include: "(1) A charge imposed for a specific benefit conferred or privilege granted directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of conferring the benefit or granting the privilege. [¶] (2) A charge imposed for a specific government

The local government has the burden of proving, among other things, "that a levy, charge, or other exaction is not a tax . . . ." (*Id.,* § 1, subd. (e), final par.)

The general rule is that a person may not sue to recover excess taxes paid by someone else, "who pays the tax by design or mistake." (*Grotenhuis v. County of Santa Barbara* (2010) 182 Cal.App.4th 1158, 1165; *id.* at pp. 1164-1165 [the plaintiff could not sue to recover excess property taxes paid by a corporation of which he was the sole owner and from which he leased the property; section 5140 of the Revenue and Taxation Code allows only the person who paid the tax to bring a tax refund action].) There may be unusual circumstances that permit an exception to the general rule (as we discuss, *post*). But we know of no case where a person who has not paid the tax to the taxing authority, and who has no legal responsibility to do so, has been found to have standing to seek a refund of the tax. We find no merit in any of the arguments plaintiffs make in support of a contrary conclusion.

Plaintiffs proffer several contentions.

First, plaintiffs say they "actually paid the illegal tax, not the providers," so "the 'general rule' requires that plaintiffs have standing to obtain a refund." Plaintiffs paid nothing to the counties, and they had no legal responsibility to pay anything to

---

service or product provided directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of providing the service or product. [¶] . . . [¶] (4) A charge imposed for entrance to or use of local government property, or the purchase, rental, or lease of local government property. . . ." (Cal. Const., art. XIII C, § 1, subd. (e).)

8

the counties.  Simply asserting that they effectively or indirectly "paid the illegal tax" does not make it true.  Plaintiffs may have paid exorbitant charges to the *telephone provider*, but they did not make any payment to the *county* and they had no legal obligation to do so.  Plaintiffs ask us in effect to find that a customer, who pays higher prices because of a tax on a vendor who raises prices in order to recover the amount of the tax from the customer, has standing to seek a refund.  No legal authority supports that position.[6]

Second, plaintiffs contend they have standing to seek a refund of fees prohibited by Proposition 26 because their litigation "effectuates the purpose of the statute and because they have a beneficial interest in the outcome."  They cite the principle that "[s]tanding rules for statutes must be viewed in light of the

---

[6]    Defendants cite several cases for the proposition that courts have repeatedly rejected plaintiffs' " 'indirect' payment theory" of standing.  As the trial court pointed out, while these cases are not inconsistent with our conclusion, they are not relevant to plaintiffs' assertions.  All of them involve taxpayer standing under Code of Civil Procedure section 526a, that is, taxpayer standing to prevent "any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a local agency." (§ 526a, subd. (a).)  This is not such a case. (See, e.g., *Torres v. City of Yorba Linda* (1993) 13 Cal.App.4th 1035, 1047-1048 [plaintiffs who challenged the validity of a proposed redevelopment project did not having standing to sue as taxpayers based on their payment of a sales tax; while the price of goods was increased by the amount of the tax, the tax was imposed on the retailer, not the consumer]; see also *Reynolds v. City of Calistoga* (2014) 223 Cal.App.4th 865, 872-873 [taxpayer standing under section 526a cannot be based on payment of sales tax because sales tax is imposed on the retailer, not the consumer].)

intent of the Legislature and the purpose of the enactment." (*White v. Square, Inc.* (2019) 7 Cal.5th 1019, 1024.) They say that if we apply the rule that only the providers who directly pay money to the defendants have standing, we "would both frustrate the very reason the voters passed Proposition 26 and deprive the only aggrieved parties from seeking redress."

We are not persuaded. We agree, of course, that Proposition 26 "was an effort to close perceived loopholes in Propositions 13 and 218." (*Schmeer v. County of Los Angeles* (2013) 213 Cal.App.4th 1310, 1322; *id.* at pp. 1313-1314 [concluding a paper carryout bag charge was not a tax under Proposition 26 "because the charge is payable to and retained by the retail store and is not remitted to the county"].) *Schmeer* quotes in full the findings and declaration of purpose of Proposition 26 as recited in its ballot materials. (*Schmeer,* at pp. 1322-1323.) The findings clearly express the voters' concern with "disguis[ing] new taxes as 'fees' " to avoid constitutional voting requirements, and the voters' intent to prevent the Legislature and local governments from "circumvent[ing] these restrictions on increasing taxes by simply defining new or expanded taxes as 'fees.' " (Voter Information Pamp., Gen. Elec. (Nov. 2, 2010) text of Prop. 26, § 1, p. 114.)

But nothing in Proposition 26, or anything plaintiffs have cited, suggests that taxes under Proposition 26 are to be treated differently from taxes under any other statute or constitutional provision when a refund of those taxes is sought. Plaintiffs point us to no cases under this or any other proposition where the plaintiff challenging the charge is not a person who paid the tax to the taxing authority or who was legally obligated to pay it. The voters' intent to prevent circumvention of voting

10

requirements on tax increases tells us nothing of any intent to change the standard principles governing lawsuits challenging those taxes.

The cases plaintiffs cite to support a contrary conclusion do not do so. We turn to those cases.

Plaintiffs cite *Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248 (*Jacks*) for the proposition that we should liberally construe Proposition 26 " 'to effectuate its purposes of limiting local government revenue and enhancing taxpayer consent.' " (*Jacks,* at p. 267, quoting Prop. 218.) But *Jacks* was not referring to standing, and there was no issue of standing in the case. The court stated that the proposition at issue in that case, Proposition 218, should be liberally construed when "resolving [the] issue" of "[w]hether a charge is a tax or a fee." (*Jacks,* at p. 267.) We do not disagree, but that has nothing to do with standing to seek a refund. The same is true of the additional authority the parties discussed at oral argument—*Zolly v. City of Oakland* (2020) 47 Cal.App.5th 73[. The plaintiffs in *Zolly* sought declaratory and injunctive relief, and there was no issue of standing in the case.

Plaintiffs cite *Weatherford v. City of San Rafael* (2017) 2 Cal.5th 1241 for the proposition that determining standing requires "ascertain[ing] and effectuat[ing] the law's intended purpose." (*Id.* at p. 1246.) But the court was construing a statute on standing—Code of Civil Procedure section 526a—governing who may maintain an action to prevent illegal expenditure or waste of local agency funds or property. The question before the court was what type of tax payments bestow standing on an individual plaintiff to sue a local government. The court determined that section 526a did not limit standing to

individuals who paid *property* taxes, but included anyone who has paid or is liable to pay a tax directly to the defendant locality. (*Weatherford,* at pp. 1251, 1252.) *Weatherford* does not assist plaintiffs, because they did not pay a tax directly to any government entity.

Plaintiffs contend taxpayers have standing to sue the taxing entity "if they are the ones who pay the tax or have a stake in the outcome, unless a specific statutory refund procedure is otherwise mandated by statute." For this assertion, they cite *Ardon v. City of Los Angeles* (2011) 52 Cal.4th 241. In *Ardon*, the court held that "[c]lass claims for tax refunds against a local governmental entity are permissible under [Government Code] section 910 in the absence of a specific tax refund procedure set forth in an applicable governing claims statute." (*Id.* at p. 253.) (Section 910 governs the presentation of claims against public entities and was the relevant "governing claims statute." (*Ardon,* at p. 251.))

*Ardon* does not help plaintiffs either. The question was whether a class claim for refund of a telephone users tax was permissible, or whether each member of the class had to file a government claim with the city before a class action could proceed. (*Ardon, supra,* 52 Cal.4th at pp. 245, 246, 250.) In *Ardon*, the plaintiff taxpayers were legally obligated to pay the tax. That is not the case here.

Next, plaintiffs cite *TracFone Wireless, Inc. v. County of Los Angeles* (2008) 163 Cal.App.4th 1359 (*TracFone*). There, the plaintiff was a long-distance service provider that sold prepaid telephone calling cards to retailers who resold them to the ultimate consumers. The plaintiff paid the county's user tax, amounting to 5 percent of the value of calls made with the cards

12

in the county, from its own funds.  The plaintiff did not collect the tax from the consumers who were responsible for its payment, because it had no point of contact with the ultimate consumer and was unable to do so.  For reasons unnecessary to recite, it turned out that cards of the type the plaintiff sold were tax exempt, so the plaintiff sought a refund.  (*Id.* at pp. 1361-1362.)  The trial court found that although the plaintiff was required to collect the taxes, it was not a "taxpayer" and thus lacked standing to seek a refund.  (*Id.* at p. 1364.)  The appellate court rejected as "outdated" the notion that a party has no standing to challenge a tax unless it is the denominated "taxpayer" under the statutory scheme imposing the tax.  (*Ibid.*)  The court held that the plaintiff had standing to seek a refund of taxes paid from its own funds.  (*Id.* at p. 1366.)

Plaintiffs liken themselves to the plaintiff in *TracFone*, saying they "are the ones who actually pay the money 'from [their] own funds.' "  But they are not like the *TracFone* plaintiff, who was required by the user tax scheme to collect the taxes, and who paid the taxes from its own funds directly to the taxing authority, believing the county would hold it liable for the tax.  (*TracFone, supra,* 163 Cal.App.4th at p. 1362.)  We see no comparable circumstances here.

Plaintiffs also cite *Delta Air Lines, Inc. v. State Board of Equalization* (1989) 214 Cal.App.3d 518, where the court found Delta had standing to seek a refund of fuel taxes it paid to the Board.  Explaining the factual background would unduly lengthen this opinion.  Suffice it to say that the fuel vendor was the taxpayer; some parts of Delta's fuel purchases were tax exempt, and the vendor paid taxes pursuant to Delta's estimates of the taxable portion of its fuel purchase; a regulatory change

13

occurred requiring actual rather than estimated fuel consumption computations; the Board audited Delta and assessed additional taxes. Delta paid the assessment, but sought a redetermination for a nine-month period during which the auditors assessed Delta for underpayments but refused to allow an offset for overpayments. (*Id.* at pp. 520-524.)

The court rejected the Board's contention that Delta had no standing to sue for a refund under the circumstances presented, pointing out that the law "regards common carriers such as Delta as retailers as well as purchasers, for the purpose of computing the parameters of [its] exemption," and the Board audits Delta to ensure the exemption is used properly. (*Delta, supra,* 214 Cal.App.3d at p. 528.) In a dispute over the audit procedure, "it would be irrational to hold that Delta has no standing to contest a determination of substantial funds due for which Delta was legally responsible. To hold otherwise might permit unjust enrichment of the Board. Delta is clearly the real party in interest here, has paid the disputed tax due (which concededly could not have been collected from Delta's vendors), and has standing to pursue the action for refund." (*Ibid.*) Again, plaintiffs' position with respect to the disputed charges is in no way comparable to Delta's position. Plaintiffs have not paid a tax directly to a taxing authority.

Next, plaintiffs tell us that cases involving standing to seek a refund of sales taxes are inapplicable. This, they say, is because the sales tax cases are based on a comprehensive and complex statutory scheme that defines the taxpayer as the retailer, and provides an administrative scheme for seeking a refund, unlike challenges under Proposition 26. They refer us to *Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, where the court

14

held that consumers could not maintain a class action against a retailer (disputing the taxability of purchases of hot coffee "to go") under the unfair competition law and the Consumer Legal Remedies Act.  It seems to us that, to the extent *Loeffler* is pertinent, it supports our determination that plaintiffs lack standing.

As the trial court pointed out, *Loeffler* demonstrates why the law thus far has not recognized standing for consumers who pay higher prices because of a tax on a vendor who recovers the tax by raising prices.  *Loeffler* states:  "As a practical matter, if we did not view the tax code as providing the exclusive procedure under which a claim such as plaintiffs' may be resolved, independent consumer claims against retailers for restitution of reimbursement charges on nontaxable sales could form a huge volume of litigation over all the fine points of tax law as applied to millions of daily commercial transactions in this state." (*Loeffler, supra,* 58 Cal.4th at p. 1130.)  A similar effect is likely if any consumer who pays prices influenced by taxes that affect the seller's cost of doing business has standing to sue the taxing authority.

Plaintiffs assert *Loeffler* "make[s] clear" that where an improper tax is collected by an intermediary, "an adequate remedy must be provided to ensure the aggrieved customer/taxpayer has a means to obtain a refund."  That is not the import of *Loeffler*.  Plaintiffs are referring to *Loeffler*'s description of another case—*Javor v. State Board of Equalization* (1974) 12 Cal.3d 790 (*Javor*)—where the Board of Equalization had already instructed retailers they were entitled to a refund of mistakenly paid excess sales tax, provided they returned the refund to the customer.  (*Loeffler, supra,* 58 Cal.4th at p. 1115.)

15

Under the "unique circumstances" in *Javor* (*Javor,* at p. 802), where the retailer had no particular incentive to request the refund (*id.* at p. 801), and the Board was "very likely to become enriched at the expense of the customer" (*id.* at p. 802), *Javor* stated that "we . . . must fashion an appropriate remedy to effect the customers' right to their refund which is consonant with existing statutory procedures" (*id.* at p. 800).

The remedy in *Javor* was *not* a suit against the taxing authority for a refund. Indeed, the *Javor* court indicated it would not be consonant with the tax code or judicial precedent "to fashion a remedy that would give consumers a cause of action against the Board for the excess amounts the retailer had paid in taxes." (*Loeffler, supra,* 58 Cal.4th at p. 1114, citing *Javor, supra,* 12 Cal.3d at p. 800.) As *Loeffler* puts it, "we have permitted consumer intervention into the sales tax scheme in limited circumstances and only by means of a judicial proceeding to compel the retailer/taxpayer to seek a refund from the Board." (*Loeffler,* at p. 1101, citing *Javor*.)[7]

---

[7] *Javor* stated: "We hold that under the unique circumstances of this case a customer, who has erroneously paid an excessive sales tax reimbursement to his retailer who has in turn paid this money to the Board, may join the Board as a party to his suit for recovery against the retailer in order to require the Board in response to the refund application from the retailers to pay the refund owed the retailers into court or provide proof to the court that the retailer had already claimed and received a refund from the Board. We think that allowing the Board to be joined as a party for these purposes in the customer's action against the retailer is an appropriate remedy entirely consonant with the statutory procedures providing for a customer's recovery of erroneously overpaid sales tax." (*Javor, supra,* 12 Cal.3d at p. 802, fn. omitted.)

16

We do not agree with plaintiffs that, because the counties are unjustly enriched by their contracts with the telecommunications companies, we should provide inmates a remedy for the exorbitant telephone charges they must pay. It is the legislative branch, not the courts, that must provide that remedy. As the trial court observed, "[t]he political branches have not shown themselves to be deaf to arguments against fees that fall primarily on those least able to pay." (Cf. *McClain v. Sav-On Drugs* (2017) 9 Cal.App.5th 684, 706 ["our Constitution chiefly assigns the task of creating tax refund remedies to our Legislature, and our Legislature has yet to address the situation that arises when the legal taxpayer has no incentive to seek a direct refund and the economic taxpayer has no right to do so. It is a topic worthy of legislative consideration."], *affd.* (2019) 6 Cal.5th 951, 955 [customers who paid sales tax reimbursement on purchases they believed to be exempt from sales tax may not file suit to compel the retailers to seek a tax refund when there has been no determination that the purchases are tax exempt].)

Finally, plaintiffs contend that if they lack standing, they have no meaningful opportunity for review in violation of due process. They cite *TracFone, supra,* 163 Cal.App.4th at pages 1365-1366, and *McKesson Corp. v. Florida Alcohol & Tobacco Div.* (1990) 496 U.S. 18. This due process claim (which was made below only by way of a two-sentence footnote) is again premised on the assertion that "they actually paid the tax." It ignores the fact that plaintiffs did not pay anything to the taxing authority and had no legal responsibility to do so. As *TracFone* states, it is *because* "California requires payment of a tax prior to challenging it" that the right to due process requires some procedure for meaningful review. (*TracFone,* at pp. 1365-1366.) In *TracFone,*

17

the plaintiff was required to collect the taxes and paid them from its own funds to the taxing authority.  That is not the case here.

*McKesson* does not help plaintiffs either.  In that case, the plaintiff had paid excise taxes to the state of Florida that had been found to be unconstitutional.  Under those circumstances, due process required the state "to afford taxpayers a meaningful opportunity to secure postpayment relief for taxes already paid pursuant to a tax scheme ultimately found unconstitutional." (*McKesson, supra,* 496 U.S. at p. 22; cf. *McClain, supra,* 6 Cal.5th at p. 961 ["we do not agree with plaintiffs that the unavailability of a judicially created refund remedy in this case violates due process of law"].)

In the end, the pertinent point is that *no* precedents support plaintiffs' claim that a consumer who pays charges to a third party vendor—including one that has inflated its prices to recover the cost of a tax it pays to a local government—has standing to seek a refund of those charges from the taxing authority.  As we have said, we see no basis for treating purported Proposition 26 taxes, for standing purposes, differently than sales taxes, or property taxes, or telephone user taxes, or airplane fuel taxes, or any other taxes.  The change that Proposition 26 effected was an expansion in the definition of a tax—not an expansion in long-established principles governing who may sue for a refund of that tax.  That continues to be the person upon whom the tax is imposed by the taxing authority or who has a legal obligation to pay it to the taxing authority.  That is not the plaintiffs.

Because we conclude the trial court correctly found plaintiffs have no standing to bring a claim under Proposition 26,

18

we refrain from addressing the merits of their claim that the telephone charges are a tax in violation of Proposition 26.

**2.     Government Code Section 11135**

Government Code section 11135 prohibits the denial of full and equal access to the benefits of, or discrimination under, any program or activity that is conducted by, or is funded directly by, or receives any financial assistance from, the state.[8]

Plaintiffs allege inmates and their families were disproportionately African-American and Latino, compared to the overall population of the respective county defendants, and also that they disproportionately suffer from mental illness and drug addiction.  Each defendant receives "a significant amount of money from the State of California" that "goes to fund various activities of the Defendant Counties, including their county jails and the jails' inmate calling systems."  Plaintiffs allege there was no justification for the imposition of the inmate calling system charges, and "in any event, they can be replaced by an equally effective but less discriminatory alternative (e.g., a reasonable fee, or a general tax or fee) not aimed specifically at the disproportionately African-American and Latino population that

---

[8]     "No person in the State of California shall, on the basis of sex, race, color, religion, ancestry, national origin, ethnic group identification, age, mental disability, physical disability, medical condition, genetic information, marital status, or sexual orientation, be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state. . . ." (Gov. Code, § 11135, subd. (a).)

currently pays the [inmate calling system] charges out of which the Defendant Counties receive the lion's share."

The trial court concluded plaintiffs did not state a claim, because they did not allege African-American or Latino inmates and their families are treated differently from inmates and their families who are not members of those groups. The court did not err.

" 'The basis for a successful disparate impact claim involves a comparison between two groups — those affected and those unaffected by the facially neutral policy.' " (*Darensburg v. Metropolitan Transportation Commn.* (9th Cir. 2011) 636 F.3d 511, 519-520 (*Darensburg*).) "[W]e must analyze the impact of the plan on minorities in the population base 'affected . . . by the facially neutral policy.' " (*Id.* at p. 520.) " '[T]he appropriate inquiry is into the impact on the total group to which a policy or decision applies.' " (*Ibid.,* quoting *Hallmark Developers, Inc. v. Fulton County* (11th Cir. 2006) 466 F.3d 1276, 1286.)

The "total group" to whom defendants provide telephone service by means of their contracts with providers is the inmate population; defendants do not provide telephone service to any other group. Consequently, the only appropriate inquiry is an analysis of the impact on minorities "in the population base 'affected' " (*Darensburg, supra,* 636 F.3d at p. 520), and that is the inmate population. There is no other relevant group. And African-American and Latino inmates are treated exactly the same as any other inmates.

Plaintiffs insist that the comparator group "is the general population, which accesses telephone usage without having to pay an illegal tax." The general population is the comparator group, they say, "because the cost of the inmate telephone calls,

20

and the exorbitant commissions, is borne by the inmates' non-custodial family and friends, who otherwise enjoy normal phone charges." We find this argument difficult to comprehend, but in any event plaintiffs do not support it with any legal authority. No matter who bears the cost, inmates or their families and friends, it remains the case that the complaint does not allege defendant counties provide telephone service to the general population, and consequently the general population of telephone users cannot be the appropriate "comparator group."

Moreover, as the trial court pointed out, the Legislature established a basis for treating inmate families differently from other taxpayers in Penal Code section 4025. Section 4025 clearly reflects a legislative decision to allow county jails to collect commissions on telephone calls to and from inmates, to be deposited in an inmate welfare fund. (*Id.,* subd. (d).) Plaintiffs allege no basis to conclude the Legislature's determination to permit such commissions and direct their use is not an adequate rationale for treating plaintiffs differently from other taxpayers.

In short, the complaint does not state a claim for discrimination on the basis of race or any other protected category in connection with the telephone charges inmates pay to use the inmate calling system.

### 3. The Bane Act

Under the Bane Act, if a person interferes "by threat, intimidation, or coercion," or attempts to do so, with any individual's exercise or enjoyment of rights secured by the Constitutions or laws of the United States or California, the individual may bring a civil action for damages and other relief. (Civ. Code, § 52.1, subds. (b) & (c).) The court may award the plaintiff reasonable attorney fees. (*Id.*, subd. (i).)

21

Plaintiffs contend defendants violated their families' rights under the Bane Act "by 'interfer[ing] by . . . coercion' with their rights under Proposition 26."[9] They say they are "forced into the coercive choice of using the telephone despite unlawful, exorbitant and discriminatory charges or foregoing telephonic communications."[10]

We find no support in any authorities under the Bane Act for the proposition that a choice between paying an exorbitant telephone charge or foregoing telephone communication constitutes the "threat, intimidation, or coercion" required to establish a Bane Act violation. This is so under either of the analyses courts have applied, in the context of Fourth Amendment violations, to determine whether coercion has been shown, as discussed below. And, entirely aside from those analyses, we do not think the imposition of a tax, however exorbitant, may constitute coercion within the meaning of the Bane Act.

### a. *Shoyoye*

The first theory of coercion is that a violation of the Bane Act requires a showing of coercion independent from the coercion

---

[9] In their opposition in the trial court, plaintiffs limited their Bane Act claim to the families and friends of inmates. Defendants tell us this is because of statutory provisions governing public entity liability for injuries to prisoners, citing Government Code section 844.6.

[10] Plaintiffs also claim interference by coercion with their rights under Government Code sections 11135 and 50030. Our analysis of coercion under the Bane Act would be no different as applied to a claimed violation of sections 11135 and 50030.

inherent in the constitutional violation itself.  (*Shoyoye v. County of Los Angeles* (2012) 203 Cal.App.4th 947, 959 (*Shoyoye*).)

 *Shoyoye* was a wrongful detention case (a prisoner's overdetention based on computer error).  *Shoyoye* concluded the Bane Act was intended to address interference with constitutional rights "involving more egregious conduct than mere negligence."  (*Shoyoye, supra,* 203 Cal.App.4th at p. 958.)  The court went on to say that violation of the Bane Act requires a showing of coercion "independent from the coercion inherent in the wrongful detention itself."  (*Shoyoye,* at p. 959.)

 Plaintiffs have not alleged coercion other than the required payment of the telephone charges.  Other than payment of the exorbitant charges, there is no tax and no coercion.  Under the *Shoyoye* analysis, plaintiffs' claim fails.

  **b.** ***Cornell***

 The second analysis appears in *Cornell v. City and County of San Francisco* (2017) 17 Cal.App.5th 766 (*Cornell*).  *Cornell* held that, "where an unlawful arrest is properly pleaded and proved, the 'threat, intimidation or coercion' element of section 52.1 . . . requires a specific intent to violate protected rights."  (*Id.* at p. 799; *ibid.* ["we do not accept the premise that *Shoyoye* applies in unlawful arrest cases"].)  The plaintiff showed subjective spite; the arresting officers were unconcerned from the outset whether there was legal cause to detain or arrest the plaintiff, and "when they realized their error, they doubled-down on it, knowing they were inflicting grievous injury on their prisoner."  (*Id.* at p. 804.)

 The specific intent test requires a legal determination whether the right at issue is " ' "clearly delineated and plainly applicable under the circumstances of the case," ' " and a factual

determination whether the defendant committed the act in question " ' "with the particular purpose of depriving the citizen victim of his enjoyment of the interests protected by that . . . right." ' " (*Cornell, supra,* 17 Cal.App.5th at p. 803.)  *Cornell* found "[l]egally, . . . nothing vague or novel" about the plaintiff's claim of the right to be free from arrest without probable cause "under the circumstances of this case." (*Ibid*.)

Plaintiffs' allegations of coercion do not meet *Cornell*'s specific intent test.  Plaintiffs do not claim a clearly delineated and plainly applicable right in this case, and therefore they cannot show defendants acted with the particular purpose of depriving plaintiffs of any such right.

Plaintiffs say their right under Proposition 26 is clearly delineated and plainly applicable, because "the commissions unquestionably exceed reasonable cost."  That does not establish the existence of an unlawful tax under Proposition 26, as the parties' respective arguments on the merits of that issue clearly show.  And without a clearly delineated and plainly applicable right *under the circumstances of the case*, plaintiffs cannot demonstrate the necessary specific intent to deprive them of that right.

There is no legal authority on the question whether a site commission, paid under contracts between telephone providers and defendant counties, is a tax, and we do not decide that question either.  Plaintiffs' alleged right to a refund of inmate telephone service charges is neither "clearly delineated" nor "plainly applicable."  Consequently, defendants cannot have had the requisite specific intent to violate plaintiffs' Proposition 26 rights when they entered into the contracts with the telephone providers.  Plaintiffs' allegation that the facts establish an illegal

24

tax and that defendants "acted with the purpose of charging excessive fees far beyond reasonable cost" is not enough under *Cornell.* (See also *Julian v. Mission Community Hospital* (2017) 11 Cal.App.5th 360, 395 (*Julian*) [conclusory allegations of coercive interference with constitutional rights " 'are inadequate to state a cause of action for a violation of section 52.1' "].)

### c. A final note

Plaintiffs cannot establish coercion under either *Shoyoye* or *Cornell.* But even apart from those analyses, we find ourselves in agreement with the trial court's alternative ground of decision— that the allegations of the complaint in any event "do not establish coercion of the sort contemplated by [the Bane Act]."

We construe statutory language in context, not in the abstract. "The Legislature enacted section 52.1 to stem a tide of hate crimes. [Citation.] The statutory language fulfills that purpose by providing remedies for certain misconduct that interferes with" any rights secured by federal or California law. (*Jones v. Kmart Corp.* (1998) 17 Cal.4th 329, 338 (*Jones*).) "[A]s long as interference or attempted interference with [legal rights] is accompanied by threats, intimidation, or coercion, section 52.1 provides remedies for that misconduct." (*Ibid.*)

The Legislature's purpose suggests to us that the coercive nature of a tax—however exorbitant or unfair that tax may be— was not what the Legislature had in mind when it forbade interference with legal rights by "threat, intimidation, or coercion." Plaintiffs have cited no case where economic or monetary pressures alone have been found to constitute coercion under the Bane Act.

Plaintiffs quote a dictionary definition of coercion ("to compel to an act or choice by force, threat, or other pressure"),

citing a decision construing fair housing statutes. (*Walker v. City of Lakewood* (9th Cir. 2001) 272 F.3d 1114, 1129.) They also cite *Koontz v. St. Johns River Water Management Dist.* (2013) 570 U.S. 595, 604-605 (discussing coercion under the unconstitutional conditions doctrine). These cases are simply inapt to the issue at hand. The question here is the meaning of coercion under a statute enacted with hate crimes in mind. (*Jones, supra,* 17 Cal.4th at p. 338; see also *Julian, supra,* 11 Cal.App.5th at p. 395 [" '[T]he statute was intended to address only egregious interferences with constitutional rights, not just any tort. The act of interference with a constitutional right must itself be deliberate or spiteful.' "]; *Cornell, supra,* 17 Cal.App.5th at p. 800 [coercion element "serves as an aggravator justifying the conclusion that the underlying violation of rights is sufficiently egregious to warrant enhanced statutory remedies"]; *ibid.* [describing the required "threat, intimidation or coercion" as "this element of fear-inducing conduct"].) Requiring payment of an allegedly illegal tax does not fall within the universe of egregious interference with constitutional rights as contemplated by the Bane Act and described in the cases.

At the end of their brief, plaintiffs tell us that if their pleading of coercion was deficient, they were entitled to "an opportunity to expand on each of their Proposition 26, Government Code sections 50030 and 11135 claims and why they met the requirements of [the Bane Act]." But they do not explain what more they could allege that would bring their claims within any of those provisions.

## DISPOSITION

The judgment is affirmed.  Defendants shall recover their costs on appeal.

GRIMES, J.[*]

WE CONCUR:

ROTHSCHILD, P. J.

BENDIX, J.

---

[*]     Justice of the Court of Appeal, Second Appellate District, Division Eight, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.